### PREMUDA v. GOEPEL.[1]

*(District Court, S. D. New York. March 14, 1885.)*

CHARTER—UNSEAWORTHINESS OF VESSEL—INSURANCE COMPANIES—JUDGMENT OF EXPERTS.

> The libelants chartered their ship, the P. B., to the respondents to carry oil to Trieste, and in the charter-party the ship was warranted to be seaworthy. The respondents applied to several insurance companies here and in Europe for insurance on the cargo, but after an inspection by the surveyor of one of the principal marine insurance companies, who reported the vessel unseaworthy, the companies generally refused, and the respondents were unable to obtain insurance, whereupon they threw up the charter, and the owner brought suit against the charterers for the breach of contract. The vessel took another charter and performed the voyage in safety. *Held,* that the warranty of seaworthiness is a warranty that the vessel is in such a fit condition for all the ordinary hazards of the contemplated voyage as to be approved seaworthy in the judgment of impartial and experienced men versed in the business; that the test is not whether the vessel may possibly make one or several voyages without foundering, but whether she is so staunch in her character as to approve herself fit for navigation in the eyes of competent men; that in this case, in view of the almost unanimous refusal to insure on the part of the insurance companies, who are so experienced and competent, and of the direct evidence of serious defects in her hull, the respondents were justified in abandoning the charter; and the libel should be dismissed.

In Admiralty.

This libel *in personam* was filed to recover damages for the respond-

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

ents' breach of a charter-party, in refusing to load the ship Podesta Bazzoni, on the alleged ground of unseaworthiness. The vessel belonged to Trieste. She came to this country in ballast, and arrived at Delaware breakwater in June, where she was left by her owner, who came to New York, and through brokers chartered her to the respondents for a voyage from New York to Trieste to carry 8,000 cases of petroleum. At the time of the charter it was stated to the charterers that she was classed as "A $1\frac{1}{2}$" in the American Lloyds; but this being regarded as a low rank for insurance purposes, the charterers preferred that statement of classification to be omitted from the charter-party; and instead the word "seaworthy" was inserted in writing among the warranties of the owner, no class of rating being stated. The charterers had no previous opportunity of inspecting the ship. On applying for insurance of the intended cargo, difficulty was found on account of the unsatisfactory rating of the ship. On her arrival an inspection was made by the surveyor of one of the principal marine insurance companies, who reported about one-third of her deck-beams in her upper and lower decks, between the fore and mizzen masts, materially decayed; defects in a number of the knees; and the water-ways too much open to admit of caulking; and the defects concealed. She was, accordingly, reported by him as unseaworthy, and insurance was refused. Various other applications were made for insurance in this country, and also by telegraph to insurers in London, Rotterdam, Hamburg, and Trieste. None could be obtained, except on one-fourth of the cargo by the Phœnix company here, and one offer abroad to take one-fifth if the other four-fifths could be placed, which the charterers, with all their efforts, were not able to do. These negotiations and efforts occupied the time from June 30th, when the vessel had arrived in New York and reported her readiness to receive the cargo, to the twentieth of July, when the charterers gave their final refusal to load the vessel. In the mean time repeated requests had been made to the captain to have certain repairs put upon the vessel in dry-dock. The charterers, for that purpose, had offered to advance a portion of the freight. These offers were refused, as well as any repairs, the captain claiming that the vessel was seaworthy, and that any repairs desirable could be made cheaper at Trieste. During this time the market for freight was a rising one. The respondents subsequently shipped the same cargo by another vessel at an increased freight of $3,200; while the vessel, after this refusal, proceeded to Philadelphia, where she obtained a similar cargo at an increased freight of $1,600, which in the libel is offered to be offset against claims for demurrage during the delay the ship was put to in this port, and for her expenses in coming and going, until her subsequent charter, amounting, over and above this offset, to $5,262.90. The cargo mentioned in the charter was of the value of about $40,000.

*Beebe, Wilcox & Hobbs*, for libelant.

*Jas. K. Hill* and *Wing & Shoudy*, for respondents.

BROWN, J. The charter-party contains a warranty that the vessel shall be "seaworthy, and in all respects tight, staunch, strong, and every way fitted for such a voyage." This is not a warranty that the charterers could get insurance, but it is a warranty that the vessel was insurable; that is, a proper subject for insurance at the ordinary rates for such a cargo and such a voyage. *The Vincennes*, 3 Ware, 171, 178. The fact that certain insurance companies refused insurance is not, indeed, conclusive evidence that the ship was not seaworthy; nor is the fact any more conclusive that the ship was seaworthy, that she made a subsequent voyage without foundering. Seaworthiness is, indeed, a fact to be ascertained and determined like any other question of fact. Questions of seaworthiness arise mostly after a loss has happened. But where a well-grounded suspicion of unfitness arises before loading, under a warranty of seaworthiness, a merchant is not required to put his cargo on board and run the risk of her foundering, before determining whether the ship is seaworthy or not, or whether the warranty in 'the charter-party is complied with. The question must be determined beforehand upon the judgment of those most competent to decide. Such a warranty, moreover, has reference to the necessities of business, and to the universal if not necessary practice of insuring cargoes. Practically, therefore, the warranty of seaworthiness is a warranty that the vessel is in such a fit condition for all the ordinary hazards of the contemplated voyage as to be approved as seaworthy in the judgment of impartial, competent, and experienced men versed in that business. There is no other possible way in which the charterer can determine such a question, or decide whether he may safely load the vessel, or whether he is bound to load her. Such is the practical test which the charterer has the right to apply, and which the ship must bear, or else the charter may be rightly thrown up.

In this point of view, the almost unanimous refusal of the several insurance companies to insure the cargo upon this vessel, not being limited to rate, becomes very strong presumptive evidence of the unseaworthiness of this vessel in the judgment of those most especially called upon to examine and determine such questions. This was followed up by further proof of a careful examination by a surveyor sent for the purpose to determine whether insurance should be taken or not. There is no reason to infer any bias in this case against the ship. The business of insurers is to insure all vessels fit for insurance. There are the same competitions in this business as in others. The examination disclosed a greater amount of decay in the essential parts of the ship than Lord ELDON, in the case of *Douglas* v. *Scougall*, 4 Dow, 269, considered undoubted proof of unseaworthiness. On this examination the ship's carpenter accompanied the surveyor, and made the borings testified to; and neither he nor any other witness has been called to qualify the surveyor's testimony as to the defects pointed out.

Much additional testimony was given upon this subject on the question of seaworthiness, all of which I have considered; but in my judgment it does not materially affect what has been said above. The test is not whether the ship may possibly make one or several voyages without foundering, but whether she is so staunch in her character as to approve herself as fit for the navigation contemplated, in the judgment of competent men, according to the customs and usages of the port or country; and this, clearly, this vessel was not in a condition to do. *The Vesta*, 6 Fed. Rep. 532; *The Titania*, 19 Fed. Rep. 101, 105–107; *Tidmarsh* v. *Washington Ins. Co.* 4 Mason, 439, 441; *The Orient*, 16 Fed. Rep. 916; *French* v. *Newgass*, 3 C. P. Div. 163.

In this case there is no possible suspicion that the respondents were actuated by any other motives than to avoid great risk of loss through their inability to obtain insurance of the cargo, notwithstanding great exertions to do so. It was greatly to their interest to load the vessel, if she were a fair risk, since freights were rising; and they finally effected a new charter in place of this one at a greatly increased cost. The refusal of insurance had reference solely to the unsatisfactory condition of the ship. To hold a charterer, under such circumstances as appear in this case, bound to load the ship and become his own insurer, would in my judgment defeat, in a great measure, the very purpose of the covenant of seaworthiness, and impose upon the charterer an alternative and a risk never intended by this contract. The case of *The Vesta, supra,* is applicable here, and commends itself to my judgment. I do not impugn the good faith of the master in his belief that this vessel could actually cross the Atlantic in safety, as she actually did. Nevertheless, I am quite satisfied that she was not in such a sound and staunch condition as to meet the approval of competent and impartial judges as to seaworthiness, and that the respondents were therefore justified in refusing to load her.

The libel must therefore be dismissed, with costs.