## CARD v. HINE.

*(District Court, D. South Carolina.   July 3, 1889.)*

1. ADMIRALTY—JURISDICTION.

A libel *in personam*, with attachment of the vessel, may be maintained for breach of a contract made with the agents of her owners, who are all non-residents, and who, by the law of their country, are each liable *in solido* under such contract, though but one of the owners is named in the action; the others being unknown to libelant.   The object of the suit is not to obtain a personal judgment against any of the owners, but to subject their common property to the satisfaction of their common liability.

2. SAME— ACTS OF CONGRESS.

The measure of liability is not affected by act Cong. June 26, 1884, entitled "An act to remove certain burdens on the agents of the American merchant marine, and to encourage the American foreign trade, and for other purposes," nor by act Cong. June 19, 1886, amending the former act, and making it applicable to all sea-going vessels, and also to "all vessels used on lakes or rivers, or in inland navigation, including canal-boats," etc.   These acts are not declaratory of the maritime law, but are special in their character.

3. SHIPPING—CHARTER-PARTY—EXCEPTIONS.

The owners of the steam-ship West C. entered into a charter-party with libelant for the freight-room in the ship on a voyage from Charleston, S. C., to Liverpool or the continent, she to reach the port of Charleston by November 30, 1887.   "Should the steamer not arrive at her loading-port, and be in all respects ready to load under the charter on or before that day," the charter might be canceled.   She was to be "in every respect tight, staunch, and strong, classed 100 A 1, and in every way fitted for the voyage."   The exceptions in the charter were the act of God and "all other dangers and accidents of the seas, rivers, and navigation."   November 9th she grounded on the rocks in the river St. Lawrence, and, on reaching Montreal, was promptly inspected by Lloyd's agent, who found a small leak in her water-tank.   A complete survey would have required her to go into dry-dock at Quebec, which would have caused a long delay.   The agent gave his certificate that she was sea-worthy, and fit to carry a perishable cargo, and her rating at Lloyd's remained unchanged,—100 A 1.   She then sailed for Charleston, reaching there Nov. 28.   The insurance companies at Charleston, having heard of her accident in the St. Lawrence, refused to take risks unless a survey was first had on her; but, there being no dry-dock at Charleston, the owners refused to put her on the hard, an operation attended with danger.   The best rates the insurance companies would offer were at 1¼ per cent., the ordinary rate being 9–16.   Libelant refused to accept the ship.   *Held*, that neither party was in fault; that the ship-owners were excused; and that libelant had no cause of action, except for moneys advanced to the master.

In Admiralty.   Libel for breach of charter-party.

*J. N. Nathans*, for libelant.

*J. P. K. Bryan*, for respondent.

SIMONTON, J.   The British steam-ship West Cumberland, built of iron, with water-tight compartments, was on a voyage up the St. Lawrence river to Montreal, with cargo, on 5th June, 1887.   On that day the agents of the owners in New York entered into a charter-party with libelant for the freight-room in the ship on a voyage from Charleston to Liverpool or the continent, at the lump sum of 37 shillings per ton, net register.   She agreed to reach the port of Charleston on or before 30th November.   "Should the steamer not arrive at her loading port and be

in all respects ready to load under the charter on or before that day," charterer had the option of canceling the charter. The charter provides that she must be in every respect tight, staunch, and strong, classed 100 A 1, and in every way fitted for the voyage, when she shall load a cargo of cotton, etc. The exceptions throughout the whole of the charter-party are the act of God, and others, including "all other dangers and accidents of the seas, rivers, and navigation." On 9th November, in the river St. Lawrence, she grounded on the rocks, and, after remaining a few hours, got off under her own steam. Reaching Montreal, she was inspected by Lloyd's agent at that port, on 15th November. He found a small leak in the water-tank forward, from a loose rivet; but no plates could be discovered which were broken. The survey was such as could be had at Montreal. A more complete survey would have required her to go to Quebec, and into dry-dock there. He gave his certificate that she was seaworthy, and fit to carry a perishable cargo. She was rated at Lloyd's, and, the report of the survey having been received, her rating remained unchanged,—100 A 1. She then sailed for Charleston, reached that port on 28th November, and reported to her charterer. Before her arrival, Ravenel, Johnson & Co., insurance agents, had received instructions from the companies they represented not to take risks on the West Cumberland, unless a survey was first had on her to ascertain the result of her grounding on 9th November. This was communicated to the several shippers in the port, including libelant, and put him on the inquiry. He received the papers connected with the Montreal survey from the master. After examining them, he suggested to the master to have his vessel examined again. The latter consulted his owners by cable. They said, "No." There is no dry-dock at Charleston. The ship drew 13 feet. The mean rise and fall of tide is 6 feet. Putting her on the hard—a heavy, iron ship—was attended with danger. The master tendered the ship as she was to the charterer. Thereupon Mr. Card refused to load her, and brought his action for breach of charter-party, and for moneys advanced to her. Her sailing register gave Wilfred Hine as her owner, a resident of Great Britain. The action is *in personam*, with attachment. The only defendant named is Wilfred Hine, who, and others unknown to libelant, are alleged to be the owners of the West Cumberland.

The first question in the case is, will this action lie? The moneys were advanced for the ship, at the special instance and request of the master, the agent of all of the owners of the ship. The charter-party was made with the agents of the owners, and binds all of them. These owners are all non-resident. At the time the libel was filed only one of them—Wilfred Hine—was known. The process by attachment, and the judgment thereon, can only bind the property attached. This ship is the common property, and it is attached for the common debt. Under the Code a judgment against common property for a common debt can be had, binding only the common property by serving one or some of the joint debtors. Code S. C. § 157. Mr. Benedict says that the same practice prevails in admiralty, if the joint debtors be

each liable for the whole debt. Ben. Adm. § 387. The more rigid rule, requiring that all of the owners be named, would materially impair —in many instances would destroy—the remedy by attachment. In all cases it is very difficult, in very many impossible, to ascertain the names of all the co-owners of a foreign vessel. Even when the names of her owners when she left port can be learned, changes may have occurred since her departure,—may occur at any moment, even during the preparation of the papers,—of which it is impossible to have any knowledge. Indeed, process by foreign attachment proceeds upon the ground that the defendants themselves are without the reach of process, and that the only remedy which can be given is against their property within the jurisdiction. The owners are not served. They are not in court. They cannot be served. The attachment of the property is substituted for service upon them. It binds them to the extent of the value of this property, and no further. Thenceforward the proceeding is to all intents and purposes *in rem*. It is an excellent practice, and will be followed by me. It is said, however, that the acts of congress approved 26th June, 1884, and 19th June, 1886, limit the liability of ship-owners for the joint debt to the proportion of their respective shares in the vessel. That under these acts, which counsel contend are simply declaratory of maritime law, (*The Scotland*, 105 U. S. 24; *The Belgenland*, 114 U. S. 369, 5 Sup. Ct. Rep. 860,) Wilfred Hine can only be held for 9–64 of the debt, his share being the half of 18–64. But this action is not to make Hine responsible individually, or to proceed against Hine's interest, seeking to make that responsible for the whole debt; the purpose is to make the whole common property responsible for the common debt; and Hine is taken as the representative of all the owners,—the only one of them known to libelant,—so that by process against him and his unknown co-owners all the joint property should be affected for the joint debt. The practice approved by Benedict is based upon the ground that each joint contractor is liable *in solido* for the debt. In England each co-owner is so liable for the debts of the ship. If these acts of congress change this measure of liability, the attachment cannot be sustained. But upon examination of these acts it will be perceived that they are not declaratory of the maritime law, but are special in their character. The first act is entitled "An act to remove certain burdens on the American merchant marine, and to encourage the American foreign carrying trade, and for other purposes." This apparently, in its provisions, applies only to sea-going vessels. The second act, reciting its title, amends it, and makes it apply to all sea-going vessels, and also to "all vessels used on lakes or rivers, or in inland navigation, including canal-boats, barges, and lighters." There is another consideration. The contracts here sued upon are the contracts of the owners made by the general agents of them all. By English law, as among themselves, each owner is liable *in solido* for the common debts. Story, Partn. § 455. When their agents contract for them within the scope of their authority, these agents have the same power as they have, and the same result follows as if they had contracted. Hence the acts of the agents bind each *in solido*. "The extent

of the authority of the master," and of course of any other agent of the owners, "to bind the ship, the freight, or the owners is limited by the law of the home port of the ship." *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115; *Pope* v. *Nickerson*, 3 Story, 465; *The Karnak*, L. R. 2 P. C. 505; *Steam Co.* v. *Insurance Co.*, 129 U. S. 449, 9 Sup. Ct. Rep. 469. In *The Brantford City*, 29 Fed. Rep. 384, a case quoted with strong approval in the case in 129 U. S. and 9 Sup. Ct. Rep., *supra*, Judge BROWN says: "The later English decisions hold that the law of the ship's home port should govern as respects the future and unforeseen incidents of the voyage,—such as the execution of bottomry in a port of distress, and the liability of the owners for damages beyond the value of the ship and freight." On page 385, 29 Fed. Rep., after quoting Mr. Justice BRADLEY in *The Lottawanna*, 21 Wall. 558, saying: "In matters affecting the stranger or the foreigner the commonly received law of the whole commercial world is more assiduously observed, and in justice it ought to be," Judge BROWN adds: "As respects any extension of the owner's personal liability beyond the rule of the maritime law, or any acts of the master beyond the scope of his authority as generally recognized by that law, the law of the flag may justly be invoked." This action will lie.

The case is on two distinct causes of action,—for breach of charter-party, and for certain moneys advanced for the necessities of the ship.

1. *Breach of Charter-Party.* The contract made on 5th November, 1887, warranted that the ship, after going to the port of Charleston on or before 30th November, "and being then in every respect tight, staunch, strong, classed 100 A 1, and in every respect fitted for the voyage across the Atlantic," shall load a cargo of cotton. Was she, when offered to the charterer, up to these representations? She was certainly so at the date of the charter-party. But four days afterwards she got aground on rocks. Lloyd's agent surveyed her, and, after survey, declared her seaworthy, and fit to carry a perishable cargo. The only leak —a small one—was into the water-tank forward. This tank was designed to hold water. The presence of water in it could not therefore injure any cargo she could have. The leak, being into the water-tank, water-tight on every side, was necessarily limited in the quantity of water the tank could hold. Her class with Lloyd's, 100 A 1, was, for this reason, in no respect changed; and Lloyd's is high mercantile authority, even if it be not conclusive. *Insurance Cos.* v. *Wright*, 1 Wall. 473. The master had taken proper precautions, and had reasonable ground for believing that his ship was still staunch, tight, and strong; and, if the case turned only on this, it would be so held from the evidence. See *Dupont de Nemours* v. *Vance*, 19 How. 168. Was she in every way fitted for the voyage with a cargo of cotton across the Atlantic? The charter requires her to be classed 100 A 1. It does not say where this classification shall be made. The evidence is that she was classed at Lloyd's. "None of these registers have or can have any right to determine conclusively the rate of a vessel when that question comes to be determined in a court of justice." *Insurance Cos.* v. *Wright*, 1 Wall. 473. "Like any other question of value or quantity or quality, left open in a written contract, it should be de-

cided by a reference to all the sources of information which enable the jury to fix the rate correctly. What is meant by the rating of vessels in insurance policies? It means the determination of their relative state or condition in regard to their insurable qualities." Id. The insurance companies had lost faith in her, notwithstanding Lloyd's rating. Even her owners could not obtain offers less than 1½ per cent., the ordinary rate being 9–16. This apprehension of the insurance companies did not arise from mere suspicion, or blind prejudice, or caprice. It had a substantial basis,—a reasonable ground of apprehension. It was not confined to the local companies. Now, the ship was chartered to be used in a mercantile adventure. It was evident by the terms of the charter that the charterer intended to offer his freight-room to shipping merchants. His charter-party called for the highest classification,—100 A 1. "This is not a warranty that the charterer could get insurance. But it is a warranty that she was insurable; that is to say, a proper subject for insurance at the ordinary rates for such a cargo and such a voyage." *Premuda* v. *Goepel*, 23 Fed. Rep. 411. When the charterer made his contract he expected, and had the right to expect, from the promised classification of the ship, that in his freight contracts he could compete on equal terms with all competitors. The accident of 9th November so changed "the relative state or condition" of the ship that her insurable quality was diminished, and he could only get 1½ per cent. as against 9–16. Whatever may have been her other qualities when she was offered to the charterer, she was not "in every way fitted" for the contemplated voyage. See *Stanton* v. *Richardson*, L. R. 9 C. P. 390. But this objection came from an accident arising after the date of the charter-party, and within an exception throughout the entire charter-party. Was the ship bound to remove it? Was she bound to make an inspection so thorough, and to make repairs thereon so complete, as to remove all fears of the insurance companies? Or could she stand on her contract and its exceptions? When a vessel contracts to carry a cargo, and actually receives it, and meets with an excepted accident in the inception of or during her voyage, no time being limited, she must repair, and continue and complete the voyage, if the repairs can be completed within a reasonable time. *Jackson* v. *Insurance Co.*, L. R. 10 C. P. 125. So, also, a vessel under charter-party, in which no definite time is fixed, meeting a disabling accident within an excepted peril, must repair damages resulting therefrom, and perform her contract, if this can be done in a reasonable time. Id. But here we have a charter-party requiring her to be at the loading port by a fixed date, and in every way fitted for the voyage, with option of cancellation in the charterer on default,—two conditions precedent, both to be performed. The excepted accident made one or the other impossible. If she had waited to go into dock, be surveyed, and repaired, she could not have reached the loading port in time. As it was, she was within two days only of its extreme limits. She saved her time, and the other condition precedent could not be fulfilled. Besides this, it would be unjust to require the ship to delay her voyage, and so lose her right to enforce the charter-party, and to make a minute examination for

injuries and perfect repair, if any perchance were found, and, when this is all done, to be entirely at the mercy of the charterer, who could reject her simply because she was too late. The master did all that he could reasonably be required to do. Promptly after the accident he had his ship inspected by the agent of Lloyd's, who gave him his rating. Being assured that the accident had not lost him his rating, but left his ship still seaworthy, and able to carry perishable cargo, he went on, and fulfilled the time of his charter-party, tendering his ship to his charterer. He met a condition of things he could not have anticipated. With every assurance that his ship was staunch, strong, tight, classed 100 A 1, he found that she was not fitted for the voyage because the insurance companies feared her, and required a survey which could not be held. This he could not control. He had no means in the loading port of satisfying the insurance companies. It would have been unreasonable to compel the charterer to load the ship with cotton, if, after doing so, he must go without insurance, or submit to injurious rates. It would "have been equally unreasonable to make the ship-owner responsible because she was not a proper subject for insurance at ordinary rates," when reasonable precaution had been taken to ascertain the extent of her injuries, and when her master had come to fulfill his contract, armed with certificates of very high authority. "The circumstances excuse the ship-owner, but give him no right. The charterer has no cause of action, but is released from the charter. When I say 'he' is, I think both are. The condition precedent has not been performed, but by default of neither." *Jackson* v. *Insurance Co.*, *supra*.

2. During the stay in this port of the West Cumberland, libelant advanced to her master for her purposes the sum of $142.85. The items are not disputed, nor is the advance or its necessity denied. The amount certainly should have been paid. Let libelant take his decree for the amount of $142.85, with interest from the 2d December, 1887, and costs.