BIRT, POTTER & HUGHES, Limited, v. HARDIE et al.

(District Court, S. D. New York. June 17, 1904.)

**1. Shipping—Charter Party—Discretion of Master as to Cargo to be Received.**

Notwithstanding a provision of a charter party requiring the ship to receive all such lawful cargo as the charterers may think proper to ship, some discretion is left in the master, whose duty it is to exercise his judgment for the benefit of all concerned; and where the owners are responsible for proper stowage and safe carriage he is justified in refusing to load goods where there is danger that they will injure, or be injured by, other cargo previously loaded.

**2. Same—Danger of Damage to One Part of Cargo from Another—Kerosene and Flour.**

Libelants chartered a sailing vessel from respondents to carry a general cargo from New York to Australia. The charter party required the vessel to receive all such lawful goods and merchandise as the charterers or their agents might think proper to ship, and provided for the giving of bills of lading by the master under which respondents would be responsible for safe stowage and carriage. After loading some 13,000 cases of refined petroleum in the fore part of the lower hold, the charterers desired to load for another party 300 tons of flour in sacks to be stowed in the after between decks. Being apprehensive that the flour might be damaged during the voyage by fumes from the oil, the master, after consulting authorities and persons having experience, required the charterers to give a letter of indemnity against such risk, or to have any claim for damage on that account waived by the owners. These were refused, and both parties then attempted to obtain insurance against the risk both in London and New York. Being unsuccessful, the master refused to load the flour, and sailed without it. The evidence was conflicting as to whether or not there was real danger from such cause. *Held,* that under the circumstances, and especially in view of the refusal of underwriters to accept the risk, the master was justified in his action, and that his judgment, being formed in good faith, was controlling.

In Admiralty.

Wing, Putnam & Burlingham, for libellant.

Convers & Kirlin (J. Parker Kirlin and Charles R. Hickox, of counsel), for respondents.

ADAMS, District Judge. This action was brought by the corporation of Birt, Potter & Hughes, Limited, the charterer of the ship Albuera against John Hardie & Company, her owners, to recover the damages alleged to have been sustained by reason of the refusal of the master to receive as a part of her cargo some 300 tons of flour in sacks, on a voyage from New York to Australia, the property of third persons, unless the charterer would give him a letter of indemnity against any damages the flour might suffer from the fumes of some 13,140 cases of refined petroleum, and 100 cases of turpentine, which had been previously laden, or without adding a clause to the bills of lading relieving the ship from possible claims for damage to the flour arising from fumes of the oil or turpentine. The charterer afterwards was willing to unload the latter, and it need not be further considered.

The charterer refused to give the required letter of indemnity and the shippers of the flour refused to allow the exceptive clause to be

added to the bills of lading. The master thereupon refused to receive the flour on board.

This happened in the early part of October, 1902. The vessel was then about to start on a voyage from New York to Sydney. The flour was subsequently sent forward by the charterer on a steamer, at an increased rate of freight, and it sues for the additional freight and expenses, said to amount to about $6,000.

The charter party was made in London on the 28th day of May, 1902, and provided that the ship, then in Rotterdam, should proceed to New York and load a cargo of lawful merchandise for a port in Australia, and, inter alia, further:

"That the said vessel, guaranteed by the owners to be in a sound and seaworthy condition, shall be kept tight, staunch, well fitted, tackled and provided with every requisite and with men and provisions necessary for such a voyage as hereinafter mentioned, shall, with all convenient speed proceed to New York and there at such proper berth in such Dock and/or in the River, as ordered by Charterers, receive and take on board a full and complete cargo of lawful merchandise and being so loaded shall therewith proceed with all possible dispatch to Sydney N. S. W. or to Adelaide & Sydney or to Melbourne.

* * * * * * * * * *

That the whole of the said vessel under deck from stem to stern, shall be at the sole use and disposal of the charterers during the voyage aforesaid, with the exception of the necessary and usual accommodations for the master, officers and crew, and also necessary room for the stowage of sails, cables, provisions, water, &c., for the ship's company for this voyage.

Vessel to receive all such lawful goods and merchandise as the charterers or their agents may think proper to ship, and that no other goods or merchandise whatever shall be laden on board, otherwise than from the charterers or their agents, without their written consent.

* * * * * * * * * *

The charterers engage to pay to the Owners, or their agent, for the charter or freight of the said vessel for the voyage aforesaid, the lump sum of £2250 if ordered to Sydney N. S. W.

* * * * * * * * * *

Charterers' responsibility to cease when the cargo is all on board, and Bills of Lading signed, ship having a lien on cargo for all freight, dead freight and demurrage.

The Master to sign Bills of Lading for the Cargo as presented at any rate of Freight without prejudice to this Charter party but the amount to be sufficient in the aggregate to cover this charter and for this purpose to attend at the charterers' office daily, or oftener if required."

The Albuera was a ship rigged vessel of 1,502 tons net register. Her length was 236 feet 6 inches, her beam 39 feet 2 inches and her depth 22 feet 8 inches. She was classed in Lloyds at 100 A 1. Her lower hold was without bulkheads except one for collision purposes about 30 feet abaft the stem. She had a between deck but it was not water tight. Her ventilation facilities were as follows:

"Hatchway under top gallant forecastle, 15 ft. aft. from perpendicular, 4 ft. by 2 ft. 6 in.; combings 2 ft. 3 in. high with ventilator 7½ inches in diameter, in after hatch to lower hold into chain locker.

Ventilator 6 ft. forward of forward hatch, 15 inches diameter into between decks, and 11 inches diameter into lower hold.

Ventilator inside fife rail abaft main mast, 17½ inches diameter, into lower hold. This ventilator slips over man hole, which has combings 19 inches high.

Hatchway in amidship house, 3 ft. 3 in. by 2 ft. 6 in., into between decks.

Two ventilators 24 feet from tafrail, 11½ inches in diameter, starboard into lower hold, port into between decks.

Topmast and lower masts in one piece, with openings at topmast heads and in lower hold, which gives the best of ventilation."

The mast ventilation was plugged up and made water tight by a canvas covering. The other means of ventilation were liable to be· shut off by bad weather when the ventilators on deck had to be unshipped. Then there was no ventilation.

The oil was put up in tins, holding 5 gallons each, and the tins were enclosed two each in a wooden case. These cases were stowed in the forward part of the lower hold of the vessel from the collision bulkhead to a point about 15 feet abaft the mainmast. Aft of the oil in the lower hold, general cargo was stowed.

After all the cargo in the lower hold had been loaded, the charterer's representative in New York notified the master of the vessel of his intention to ship a part of a cargo of flour in sacks and to stow it on the between deck, some distance aft of the oil. The master at first stated no objection, but after considering the matter and making some investigation and inquiry, including an examination of *Stevens on Stowage,* and Manuals issued by the Glasgow Ship Owners Protection and Indemnity Association, and the West of England Protection ·Association, and also judging by his own experience in the carriage of oil and the effect of the fumes, having regard to the large quantity of oil stowed in the vessel, he concluded it would not be safe. He also consulted some ship-masters in New York, who advised him against taking the flour on account of the danger from the fumes of the oil. Altogether, he made what investigation he could and finally determined that it would not be safe to take the flour. He also cabled to the respondents at Glasgow, bringing the matter of the intended shipment of flour to their attention. Under his own conclusion and their instructions, he declined to receive the flour, to be stowed as intended, except on a letter of indemnity from the charterer agreeing to hold the ship owners harmless from any claims for damage to the flour from the fumes of the other cargo.

Pending the controversy about taking the flour, the charterer called in a surveyor for the New York Board of Marine Underwriters to express an opinion as to whether the flour could be carried in safety. He concluded that if the oil were effectually separated from the flour, the latter could be carried without damage from the former, and a temporary wooden bulkhead was built by the charterer of inch planks and paper tacked on it to secure such a separation. The master, however, was not consulted about this bulkhead before or at the time it was erected. The charterer's agent caused it to be put up, supposing it would remove the objection, but it did not, and the master at all times insisted that the ship should be protected against risk. When the bulkhead was erected he was not satisfied with the precaution taken and still believing that the fumes would injure the flour, because the deck was not water tight, he called upon two ship masters and a stevedore to examine the vessel. The shipmasters reported that, in their opinion, the flour would be liable to injury from the fumes of the oil on such a long voyage as was contemplated. The stevedore took the

view that the bulkhead precautions were unnecessary as far as the oil was concerned as he was of the opinion that the fumes were not dangerous to flour.

Efforts were made by both parties to insure the flour against fume damage in London and by the charterer in New York, without success. These were bona fide attempts, in which that class of London underwriters, who entertain risks outside of those incident to marine perils, were solicited for rates but would give none, excepting one company. The amount it offered to take was inconsiderable and it wanted a high rate of premium. Others refused the risk altogether, because they considered the flour would be affected by fumes from the oil and that consequently claims would arise.

The flour belonged to third parties, in no way connected with the charter party. The charterer, in order to satisfy the master, endeavored to secure from these parties the privilege of adding a clause to the bills of lading, which would exempt the ship from claims for damage to the flour by the fumes of the oil, without success, and refused to give the master a letter of indemnity against claims arising from such source.

The parties having failed to come to an agreement, the libellant filed its libel against the owners, alleging, inter alia:

"Third. The libellant thereupon entered into freight engagements with various merchants to ship cargo on the Albuera after the vessel had gone upon her loading berth. Among the lawful goods and merchandise so engaged and furnished to said ship were about 15,100 cases of refined petroleum * * * stowed in the lower fore hold together with a further shipment of about 3360 sacks of flour (300 tons weight and 375 tons measurement), which latter was arranged to be stowed in the after between decks thereof. Said proposed stowage was usual and customary in the trade from New York to Australia, and had been on September 27th specially inspected and approved by the New York Board of Underwriters. Afterwards and on October 6th said stowage was further examined and approved by surveyors chosen and called in by the respective parties."

The respondents answered:

"Third: They admit that the libelant stowed a large number of cases of refined petroleum in the lower fore hold * * * and that the libelant purposed to ship in the after 'tween-decks of the vessel a large number of sacks of flour. They deny that the intended mode of stowage was approved by any surveyor called by them or participated in by any person or persons acting for them, or by their authority. They deny that they have any knowledge or information sufficient to form a belief as to the other matters alleged in the third article of the libel."

＊　＊　＊　＊　＊　＊　＊　＊　＊　＊

"Seventh: Further answering and as a separate defense herein the respondents allege that the master of the vessel, acting in pursuance of the authority vested in him by law, and in the reasonable exercise of his best discretion, having regard to the benefit of all concerned, determined that it would be unsafe to carry the sacks of flour on the vessel with the cases of oil * * * owing to the danger that the flour, during the voyage, might become impregnated with the odor and fumes of the oil * * *, and consequently he declined to ship the flour. His determination was approved by competent shipmasters and other experienced persons whom he consulted in the matter."

There was some slight leakage of oil in this case as there always is in such shipments.

In view of the fact that the flour belonged to third parties and that their consent could not be obtained, the charterer's attempt to make the ship take the flour involved the assumption by it of any risk with respect to damage that existed. It seems that the master's attitude, if there was a risk, or if there was a reasonable apprehension of one, was correct with respect to a letter of indemnity.

The evidence leaves it very uncertain whether or not a risk of damage actually existed. It is probable that, owing to the facilities for ventilating the vessel, no damage would have ensued from the fumes on this voyage. A great many witnesses have been examined and the testimony of those familiar with this trade, tends strongly to support the libellant's contention to such effect, but it appears that a very general impression prevails that oil and flour can not be carried together without injury to the latter, even with the best facilities for ventilation. The litigation that has arisen out of the question of the carriage of oil and flour together, has turned both ways, on their peculiar facts, but my attention has been called to no case which can be regarded as authoritative here on such question.

In The Thames, 61 Fed. 1014, 10 C. C. A. 232, Circuit Court of Appeals, Fourth Circuit, the questions under consideration were the seaworthiness of the vessel with respect to her decks and the damage consequent upon the carriage of 5,000 barrels of flour stowed on top of 17,000 cases, or 34,000 cans of oil. The vessel was held liable for the damage to the flour, some of which arose from direct contact with the oil, but the greater part from the fumes, because of the lack of ventilation.

In The Fanny Fosdick, 4 Blatchf. 374, Fed. Cas. No. 4,641, a case on appeal in this circuit, the Circuit Judge affirming the decree of the court below, which dismissed a libel alleging damage to wheat from the fumes of oil, said (375, 376):

"But there is another ground upon which, on the facts of the case, I think that the libel was properly dismissed by the Court below. The wheat was delivered from the ship, in the sacks, into lighters, and was discharged from the sacks into the lighters in bulk, mingling the portion stowed in the hold, which was in the vicinity of the oil, with the portion stowed between decks. The consignees are responsible for thus blending the two parcels, and I am not at all satisfied, upon the evidence, that the portion stowed between decks was affected by the disagreeable odor of the oil, even if it had been otherwise with the portion stowed in the hold. As it respects the two hundred bags in the hold, I am not, in the conflict of the testimony, disposed to interfere with the decree. Indeed, I am inclined to think, that, if some care had been bestowed in airing and ventilating the wheat, the offensive odor would have disappeared, and the damages would have been slight, if any. A sample was brought into the Court below, which the Judge states, in his opinion, clearly failed to show that it retained any discernible effects of the taint."

The question now presented, seems to be a new one and quite important in view of the large trade that arises out of the shipment of oil and flour from this country. Trade convenience no doubt requires that it should be hampered with as few obstacles as possible, among which may be considered the demands for indemnity in connection with its ordinary shipments, about the propriety of which there should be no question. If this were such a shipment, I should have no hesitation in holding with the libellant but we do not seem to have pro-

gressed to that point where a master's apprehension of danger to cargo, if well founded, should be lightly set aside for the convenience of trade.

One of the most cogent evidences of the impression heretofore mentioned is the fact, that no underwriter could be found in London or New York to indemnify the parties against the risk. This question of insurance now enters largely into mercantile transactions and the absence of willingness on the part of underwriters to undertake the full hazard, at any rate of premium, is a strong argument in favor of the master's position. It has even been held that inability to secure insurance is sufficient to condemn a vessel as to her seaworthiness, where there was some doubt about the sufficiency of the hull, even when she afterwards safely makes the voyage, sought to be insured. Premuda v. Goepel (D. C.) 23 Fed. 410; Svendsen v. Stursberg (D. C.) 31 Fed. 86; Card v. Hine (D. C.) 39 Fed. 818.

Notwithstanding the provisions of the charter party for the loading of all such lawful goods as the charterer might think proper to ship, some discretion was left in the master, upon whom the responsibility for stowage and safe carriage rested, and it was his duty to exercise it for the benefit of all concerned.

Boyd v. Moses, 7 Wall. 316, 19 L. Ed. 192, was a case where the charter party provided for a cargo of lawful merchandise, which the charterers were to provide. A question arose as to the receipt by the ship of certain lard, the master being apprehensive, as it was to some extent in a liquid state, that it would penetrate the decks and damage some wheat stowed in the hold. A letter of indemnity was given the master by the charterers. The wheat was damaged by the lard, also the ship, and a question arose as to who was responsible for the damage. The court held that the charterers were, saying (pages 318, 319, 7 Wall., pages 193, 194, 19 L. Ed.):

"The stipulation of the charter-party to take a cargo of lawful merchandise necessarily implied that the articles composing the cargo should be in such condition, and be put up in such form, that they could be stowed and carried without one part damaging the other. Whether in any case articles offered can be taken with safety to other articles, will depend upon a variety of considerations; the nature of the articles, the state of the weather, the voyage contemplated, the amount of cargo already received, and other particulars. Lard, for example, can be carried in winter to a northern port in loose casks with little damage to other articles, whilst injury may be reasonably apprehended if the voyage is to be made through the tropics, and the casks are not perfectly tight. Very different care must necessarily be given by the master in receiving and stowing goods perishable in their nature from heat or moisture, and such as are unaffected by either. All that is required of him in such case—he being a competent officer—in determining whether particular goods are at the time in shipping order and condition, or can be received in the state and stowage of cargo already aboard, is that he shall not act capriciously or without due consideration, but shall exercise an honest and reasonable judgment in the matter.

In Weston v. Foster, 2 Curt. 119, Fed. Cas. No. 17,452, the whole of the vessel, except the cabin and room for the crew, sails, cables, and provisions, was let, and the owners covenanted to receive all such lawful merchandise as the charterers should choose to put on board. The master, who was a competent officer, took on board all the cargo he thought his vessel could safely carry, which, however, did not fill it, but left a space capable of holding fifty tons more, and the charterers insisted that there should be deducted

from the freight-money the amount they would have received if fifty tons more had been brought. But the court held that the whole charter-money was earned, and that the honest opinion of the master, though not absolutely binding on the charterers, could only be controlled by decisive evidence of a mistake on his part.

The master was here sustained in refusing to take all the cargo the hold of the vessel could receive, because, in the exercise of his honest judgment, he thought it would endanger her safety, notwithstanding the terms of the charter-party. Upon the same principle he may refuse to take goods offered, if in his honest judgment they are in such a condition or of such character that they cannot be carried without injury to the rest of the cargo."

Another authority to substantially the same effect is: The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027, where the master's duties are defined. Other cases where the judgment of the master has been deemed controlling, are: Phelps, James & Co. v. Hill, 1 Q. B. Div. 1891, p. 605, and Nobel's Explosives Co. v. Jenkins, 2 Q. B. Div. 1896, p. 326.

In the former case it was said (page 611):

"Moreover, if a master of competent skill and knowledge, and acting bona fide in the interest of all concerned, has chosen one port in preference to another, then although the court or a jury may and ought to take a different view, if they come to the conclusion that he ought to have acted differently they ought not to come to such a conclusion on light grounds. In a nicely balanced case they are fully justified in attaching considerable weight to the master's judgment and in allowing that to turn the scale in their own minds."

In the latter case, it was said (page 332):

"But apart from the terms of the bill of lading, it seems to me that the conduct of the captain would be justified by reference to the duty imposed upon him to take reasonable care of the goods entrusted to him. Whether he has discharged that duty must depend upon the circumstances of each case, and here, if the goods had been carried forward, there was every reason to believe that the ship would be detained and the goods of the plaintiffs confiscated. In the words of Willes, J., in Notara v. Henderson (1), 'a fair allowance ought to be made for the difficulties in which the master may be involved. * * * The place, the season—the opportunity and means at hand, the interests of other persons concerned in the adventure and whom it might be unfair to delay for the sake of the part of the cargo in peril; in short, all circumstances affecting risk, trouble, delay and inconvenience must be taken into account.' I am of opinion that the course taken by the captain in landing the goods and landing them in safe custody was a proper discharge of his duty. It was said that the master was not an agent for the shippers because they had protested against the discharge of the goods. But even if this information had reached the captain, it would not have divested him of his original authority and discretion as agent in any emergency for the owners of the ship and the other owners of the cargo."

These cases seem to be controlling unless the master's judgment was not honestly and prudently formed. The testimony here requires me to find that there was sufficient reason to cause a prudent master to hesitate about taking the flour, in view of the presence of oil in the vessel, and that he was justified in requiring the letter of indemnity.

Libel dismissed.