CAPUCCIO v. BARBER & CO., Inc.

(District Court, S. D. New York. November 1, 1906.)

1. SHIPPING—CHARTER PARTY—FREIGHT.

In a dispute between a steamer owner and a charterer with respect to a deduction by the charterer of 1 per cent. from prepaid freight, *held*, that under the terms of the contract the owner was entitled to full freight without deduction.

2. SAME—SHORING FOR CARGO—PART OF EXPENSE OF STOWAGE.

Where a charter party provided that the steamer should pay for the stowage and the charterer should be in no way liable for improper stowage, the vessel was liable for the cost of shoring for the cargo, which was

necessary to render her seaworthy for the voyage and to enable her to obtain insurance, notwithstanding a further provision requiring the charterer to furnish the dunnage not on board.

3. SAME—LOADING CARGO—EXTRA EXPENSE OF NIGHT WORK.
Under a charter party requiring the vessel to furnish the use of its steam winches for loading cargo day or night, but providing that the charterer should pay the extra expense, if any, incurred by reason of night work, the vessel is entitled to recover for extra wages paid to members of the crew for running the winches at night.

In Admiralty.

Convers & Kirlin and John M. Woolsey, for libellant.
Butler; Notman & Mynderse, for respondent.

ADAMS, District Judge. This action was brought by Luigi Capuccio, the owner of the steamships Dora Baltea, Cerea and Soperga, to recover certain deductions made by Barber & Company, the charterer, in settling the accounts of the vessels between the parties. The controversies turn upon the construction to be given to the charter parties under which the steamers were operated by the respondent.

## The Dora Baltea.

The charter party in this case was dated the 7th day of March, 1904. It was one of the affreightment not a demise. Under it the steamer was to proceed to Baltimore and there load a complete cargo of steel billets and proceed with them to a port in England or Wales, as ordered, and there deliver the cargo on being paid freight of nine shillings and nine pence per ton. The charter also contained the provision:

"10. * * * All steam winches to be at charterers' disposal during loading, and steamer to provide men to work same both day and night if required, charterers agreeing to pay extra expense, if any, incurred by reason of night work."

The steamer loaded at Baltimore a complete cargo of steel billets, consisting of $446^{1570}/_{2240}$ tons, and duly delivered the same at Newport, Monmouth, England, whereupon there became due the sum of £2158.0.4. The respondent before paying the freight, it is alleged, deducted £21.11.7, amounting to $105.09 and the further sum of $969.59. In addition to these sums, the libellant claims a further sum of $93.93, consisting of $22.50, extra expense of donkeymen; $18.75, extra expense for coal, and $22.68 extra expense for water. These several sums making $1168.71, the libellant now seeks to recover.

The charter party also contained the following:

"7. Charterers to have the option of appointing the Tally Clerks to receive Cargo at Steamer's loading pier, also the Stevedore to load and stow the Cargo and Bunker coals at port of loading—under the Master's supervision—Steamer paying expense of same at 35c. per 2,240 lbs. of cargo shipped, and Charterers to be in no way liable for improper stowage.

8. Charterers to provide necessary dunnage required beyond dunnage on board and steamer to load under the inspection of Underwriters' Surveyors nominated by Charterers, whose instructions as to stowage and draft of water are to be carried out.

9. The Master or person appointed by him shall sign Bills of Lading as presented without prejudice to this Charter, and the freight as per Bills of Lading to be accepted in liquidation of the amount due under this Charter; any

difference between Chartered and Bills of Lading freight being settled on clearance—if in Charterers' favor, by Captain's draft payable three days after arrival at Port of Discharge; if in Steamer's favor, in cash less 1% for interest and insurance. Charterers' liability to cease on cargo being shipped and difference of freight and/or demurrage, if any, paid, Steamer having a lien on the cargo for freight."

The respondent denies that the cargo was delivered at the charter party rates and further denies that the freight amounted to £2158.0.4 and alleges that the charter party did not provide for payment of freight at the rate of 9s. 9d. per ton in all cases but only for said rate after deduction therefrom of an amount equal to 1% of the difference, if any, by which the freight computed at the said rate exceeded the freight reserved under the bills of lading to be paid at destination and further that there was no freight reserved to be paid at destination under the bills of lading and the deduction of 1% amounted to £21.17.7 and the net freight amounted to £2136.8.9. The respondent further alleges that at the request of the master of the vessel, it disbursed the sum of $969.59 for necessary shoring for the cargo and that the freight accounts between the libellant and the respondent were duly settled at Baltimore at which time the said sum was refunded to the respondent. The respondent admits that a part of the cargo was loaded at night and that certain extra expenses were incurred for donkeymen which the respondent has at all times been willing to pay and now is upon the presentation of proper vouchers but denies that any extra expense was incurred for coal or water by reason of night work.

### The Deductions from the Amount of Freight.

The dispute in this connection has particular reference to the deduction of $105.69 from chartered prepaid freight. It is alleged by the respondent that this sum consisted of 1% of the difference between the chartered freight and the bill of lading freight to cover interest and insurance, and that such deduction was authorized by the provisions of clause 9 of the charter party above quoted.

This seems to be somewhat in conflict with the earlier provision of the contract, "payable on right and sure delivery of the cargo as per Bills of Lading in cash without credit or discount" but the provisions in connection with the facts seem to make the case clear.

The contract in the third paragraph provides for a payment of freight at destination at a stipulated rate, "as per bills of lading in cash without credit or discount." The original assumption apparently was that the bills of lading would reserve a freight payable under them at the same rate as the chartered freight and a provision was made that the master should sign such bills of lading as the charterer might present in case the freight under the bills of lading should be different from the chartered freight. If larger, the master was to sign a draft to cover the difference; if smaller, the charterer was to pay the difference in cash. It is further provided that upon payment of the difference in cash the charterer should be allowed a deduction of 1% "for interest and insurance." It appears that there was no bill of lading freight and that the chartered freight, the whole freight, was paid in advance. It is agreed that it amounted to £2158.0.4, paid

in advance, on which 1% was £21.11.7 or $105.09, the amount in dispute.

The prepayment of the freight was not in accordance with the contract provision and there is nothing to show that there was any arrangement between the parties for a prepayment. For all that appears, it might have been to the libellant's advantage to have had the freight paid at the port of destination in the saving of cost of exchange and the payment of commissions to his agents in this country on the collection.

In the subsequent charters of the steamships Cerea and Soperga, the right which is contended for here by the respondent was given to the charterer by providing that the charter freight could be prepaid at the place of shipment and that it would then be subject to a deduction of 1% but it was not stated to be for interest and insurance as here but merely a flat 1% deduction, leaving an inference that the parties construed this charter at least subject to doubt in such respect, which should be removed by a plain stipulation. Here no such right was given and the deduction seems to have been arbitrary and without merit. The owner was entitled to the stipulated freight in the absence of a clear understanding of some kind and that the amount was to be reduced in favor of the charterer. It is claimed that Par. 9, quoted supra, shows such a right to the charterer but if so it is not clear enough to have warranted the deduction.

In this respect the libellant is entitled to recover.

### The Deduction for Shoring.

Section 8 of the charter party, supra, provides that the charterer shall furnish the dunnage required, when not on board. The form of charter originally provided that the steamer should furnish the necessary dunnage but the word "steamer" was stricken out and the word "charterer" substituted with an interlineation after the word "dunnage" as follows: "required beyond dunnage on board and steamer" to load, etc. This paragraph was therefore materially changed but the preceding one, providing that the steamer should pay for the stowage and the charterer "be in no way liable for improper stowage" remained the same. The change affected the character of the transaction to some extent but it does not seem that taken altogether, it materially altered the relations of the parties with respect to their obligation regarding the stowage and the owner still remained responsible for the proper character thereof.

Dunnage consists generally of loose wood or other material usually placed upon the flooring of a vessel for the cargo to rest upon, or pieces of wood, mats, etc., jammed between barrels and other cargo to prevent motion, while shoring is used to secure the cargo after it is stowed. It is practically the same as tomming, that is fastening the cargo down to prevent motion where it does not entirely fill the space in which it is stowed and would be liable to displacement by the vessel's motion in a seaway.

As appears above (§ 7) the charterer was not to be liable for improper stowage, which was to be done at the steamer's expense. Shoring is of the same general character and with respect thereto, it is

shown by the testimony of the master that he paid the expense of it, but before doing so he protested in writing, sending the protest to the charterer. When he applied to the underwriters for a certificate of insurance they declined to give it because they did not consider the vessel seaworthy without such precaution. It does not appear that the shoring was absolutely necessary for the protection of the cargo but to have been required by the vessel for insurance purposes. See Premuda v. Goepel (D. C.) 23 Fed. 410. It was a disbursement essential to make the vessel seaworthy in such respect and as that duty was incumbent upon the owner, the charterer should not be called upon to pay such expense. Tweedie Trading Co. v. Dene Steam Shipping Co., Limited (D. C.) 140 Fed. 779, 782.

The libellant in this respect is not entitled to succeed.

### The Extra Expense for Night Work, etc.

The claim in this connection is for donkeymen, $22.50, coal $48.75, and water $22.68, making $93.93.

These sums are said to be due under clause 10 of the charter quoted above, which provided for the charterer's use of the steam winches, etc.

It appears that the charge for donkeymen was an expense recoverable from the charterer. It is alleged that the steamer was called upon to make extra disbursements for the services of these members of the crew, said to have been $22.50; also that the other items would fall under the agreement of the steamer to work at night if required. It is not clear that the last two items are recoverable but further proof may be taken by a commissioner, if necessary.

### The Claims Against the Cerea and Soperga.

These are similar to the extra services and expenses in the Dora Baltea. The libellant is entitled to recover upon proof of the amount paid out by the steamer in this connection, for which purpose a reference will be necessary.

Decree for the libellant for $105.09, with an order of reference to determine the amounts due for extra work under § 10 of the charter parties.