## Case No. 2,847.

### CLARKE et al. v. CRABTREE.

[2 Curt. 87.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1854. [2]

#### BREACH OF CHARTER-PARTY.

1. Where a charter-party contained a covenant to furnish a full cargo of salt at Bonaire, and no salt could be obtained there, it was *held* to be broken, though it was also stipulated, that the master was to "use the vessel's funds in payment for the salt which he is to purchase."

[Cited in brief in The B. J. Willard, Case No. 1,454.]

2. If the master ascertained on his arrival, that no salt could be obtained, he was not bound to wait, but might sail immediately, and recover empty for full.

[Cited in Hart v. Shaw, Case No. 6,155; The Maria White, Id. 9,083.]

[Appeal from the district court of the United States for the district of Massachusetts.

[In admiralty. Libel by Enoch Crabtree against Albert P. Clarke and others. There was a decree for libelant in the district court, and the respondents appealed.]

Goodrich and Lathrop, for appellants.
Mr. Dodge, contra.

CURTIS, Circuit Justice. This is a libel in the admiralty filed by the appellee against the appellants to recover a sum of money alleged to be due for the hire of the bark Carniola. The charter-party was entered into by the appellee, as master and agent for the owners, of the first part, and the appellants of the second part, on the 23d day of June, 1853; and it is thereby declared that the whole of the bark, except the cabin, and room necessary for the crew, stores, &c., is let to the party of the second part, for a voyage from Bonaire to Boston, after discharging at Demarara, cargo taken on board at Machias in the state of Maine. The charterers covenant to provide and furnish to the bark at Bonaire, a full cargo of salt, and to pay for the freight of the vessel fourteen cents per bushel, customhouse measure, for each and every bushel delivered at Boston, payable on the discharge of the cargo. The charter-party also contains at its close the following written clause: "It is further understood and agreed, that the master is to use the vessel's funds in payment for salt, which he is to purchase at the lowest cash price, and, on the vessel's arrival at Boston, the charterers are to pay the master, or his agent, the invoice cost of the salt, export duty, if any, and insurance on amount invested in purchase of salt from Bonaire to Boston, and Boston wharfage, all in addition to the freight." The vessel went to Bonaire; the

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]
[2] [Affirming Case No. 3,314.]

master was unable to purchase salt, owing to a failure of the supply, and returned to Boston in ballast. And the principal question is, whether, under the provisions of this charter-party, he can recover for dead freight.

If the charterers covenanted to furnish to the vessel a full cargo of salt at Bonaire, and broke this covenant, and, in consequence, the vessel returned empty, it is not denied, that according to the settled law, the charterers must pay the same freight as if a full cargo had been provided and brought; or, as it is generally expressed, empty for full. But it is denied that this is the effect of this charter-party. To decide this question, it is necessary to put an interpretation upon its very peculiar provisions; and in order to do so, the whole instrument must be examined, due effect allowed to each part so far as it qualifies, restricts, or explains other parts, and the light of surrounding circumstances applied to it, to enable me to see what the parties intended. The latter is particularly important in this case. It is always proper for the court, as much as practicable, to place itself in the condition of the parties to written instruments, so far as to know what they knew, and contracted in reference to, before construing such instruments. And it is more than commonly needful to do so, when the instrument contains provisions, manifestly adapted to and influenced by peculiar circumstances of the trade and business to which it relates.

I proceed, therefore, in the first place to state what the most material of those circumstances are. It appears, that the trade in salt, between Bonaire and Boston, is usually carried on in vessels which go to the Windward Islands with lumber, staves, ice. &c., and having discharged their cargoes, proceed to Bonaire. The salt is sold by the government directly to the exporter, for specie; the governor of the place being the seller. There are no mercantile houses established there to act as agents; and masters of the vessels which take the salt, usually purchase it. Sometimes specie is sent out from here to buy the salt; but, usually, an arrangement is made to use for that purpose, the proceeds of the outward cargo. It is thus apparent that the provisions of this charter-party are in accordance with the usual course of the trade. When the charter-party was made, the vessel was lying at Boston, having a cargo taken on board at Machias, to be delivered at Demarara: after delivering that cargo, the bark was to proceed to Bonaire. The vessel's funds, that is the proceeds of that outward cargo, were to be used in payment for salt, to be there purchased; and the master was to make that purchase. Thus far there can be no doubt. But it is strongly urged that, in substance and effect, the whole charter-party taken together, amounted only to an agreement by the charterers, to receive and pay for the salt in Boston, adding to its prime cost and charges, fourteen cents per bushel. To this I cannot accede. In the first place, it converts what is plainly a charter-party of affreightment into a mere contract to buy a cargo on arrival; and it is inconceivable, if this had been the intention of the parties, that they should not have said, in four lines, "If you will go to Bonaire and get a cargo of salt for your bark, and bring it to Boston, we will buy it of you there, and pay you therefor its prime cost and charges, and fourteen cents per bushel in addition." To suppose that merchants, of ordinary intelligence, would have resorted to a charter-party, containing all the usual provisions of such an instrument, to make a contract to buy a cargo of salt on arrival, is wholly inadmissible. Nor can such a contract be reconciled with the particular stipulations, any more than with the general frame and nature of the instrument. The charterers covenant, expressly, to furnish a cargo of salt to the vessel at Bonaire, and to pay for bringing it to Boston. The cargo contemplated was therefore to be their property, unless there is something in the instrument which controls these plain provisions, and shows that the cargo was not to belong to the charterers until arrival in Boston. I perceive nothing which can have this effect. The fact that the master was to buy the salt with the funds of the vessel, is consistent with the covenant of the charterers to furnish a cargo, and with the ownership of it by them from the moment of its purchase. If he advanced the money for them and acted as their agent in the purchase, they would own and furnish the cargo as truly as if one of them being at Bonaire should buy it, and deliver it on board. It is provided that insurance may be obtained, at the cost of the charterers, on the amount of the vessel's funds invested in the salt; but if the master made advances to buy the cargo, the owners of the vessel would have a lien on it for those advances, and an insurable interest to that extent; and, it is to be observed, it was only to that extent, insurance was contemplated. It has no tendency, therefore, to show the owners of the ship owned the cargo.

It was also argued, that the covenant of the charterers to furnish a cargo at Bonaire, was qualified by the subsequent provisions of the charter-party that the vessel's funds should be used, and the master should make the purchase; that this was the only mode of furnishing the cargo contemplated by the parties; and that inasmuch as providing the funds and buying the cargo, necessarily preceded the furnishing it to the vessel, the covenant of the charterers to furnish it, was dependent on the covenant of the master to provide funds and buy it; and therefore the latter were conditions precedent, the non-performance of which would excuse the charterers from keeping their covenant. This position requires careful examination. The

fact that the master executed this charter-party for the owners, does not change its legal effect. But it may simplify the case, to suppose the owners themselves had executed it. Thus viewed, it would contain an agreement by the owners, that the funds of the vessel should be used in purchasing the salt, and also a declaration that the master was to purchase it. But in what character, and on whose account would the master act? So far as he was to advance funds belonging to the owners, he would act as their agent, and they may properly be understood as covenanting, that they will thus advance the vessel's funds through him, as their agent; but so far as he should act in buying the cargo, he would act as the agent of the charterers; they would buy through him, and the fair interpretation of the instrument would seem to be, that the master had the permission of the owners so to act, and that they agreed he should not voluntarily neglect to act in that capacity. From the nature of the case, it cannot be supposed they intended to covenant that he should, at all events, act as the agent of the charterers in buying a cargo. Such an agency is, of necessity, revocable, and its execution must depend upon the will of the principals. From the nature of the case, too, if its execution depend upon conditions of the market, or other circumstances, the principals must be understood to take those risks. The business to which the risks belong being theirs, the risks of failure to accomplish it are theirs also; and a third person cannot be considered as assuming them, simply by agreeing that his servant may act in their behalf in the matter. Such exposition of the charter-party makes it amount to this: the owners agree that the vessels' funds shall be advanced at Bonaire, and that the master shall act as agent of the charterers to buy the cargo; the charterers covenant that they will buy the cargo at Bonaire through the master; the funds are offered, the master is ready to act as the charterers' agent, and buy the cargo, but there is no salt there. The charterers fail to keep their covenant, not because of any non-performance by the owner, but because their business cannot be done. And this interpretation seems to me to be in accordance, not only with the entire language of the charter-party, but with the nature of the contract, and the relations of the parties growing out of it. In my judgment, it would lead to much confusion and difficulty in practice, if the rights and duties of the owner were considered as affected, as claimed in this case, by a stipulation that the master should act as supercargo. We must consider for whom he acts, to whom the risk of that business properly belongs; and if found to attach to the charterer, by virtue of his character as charterer, or by his express covenants, or both, it must rest with him. In this case, the charterer covenanted to furnish a cargo. The risk of failure belonged to him. And its

burden was not shifted upon the owner, because the charterer having no agent at Bonaire, obtained the privilege of employing the master to buy the cargo.

The remaining questions do not seem to me to be attended with much difficulty.

It is objected that the master waited but twenty-four hours at Bonaire; that if a master sails away, without waiting the stipulated number of lay days, if the number is stipulated, or a reasonable number, if there be no stipulated number, he cannot recover for dead freight. Lawes, Chart. Part. 34, 35; Abb. Shipp. 463. And that the evidence shows three to five days is the usual, and therefore the reasonable number at Bonaire. But the evidence only proves three to five days, the ordinary time occupied in taking a cargo of salt on board there; not to wait to find a cargo; and if the master ascertained in less than twenty-four hours, that by waiting three to five days he could not obtain a cargo, he was not only not bound to wait, but he had no right to wait and impose the charge of lying there on the charterers. Moll. de J. Mar. bk. 2, c. 4, § 3, p. 255; Kleine v. Catara [Case No. 7,869]. I am satisfied by the evidence, that the master found his further delay there would be useless, that he did remain a reasonable time, and not being bound to wait any specified time, his departure did not deprive the owners of their right to the charter money.

It was also insisted that if the covenant of the charterers to provide a cargo was broken, the damages were but nominal, because the effect of the charter-party was to take up the vessel at Bonaire, not to send her there. I cannot accede to this view. Looking at the course of the trade, and the facts of this case, I consider the charter money was to be paid for going from Demarara to Bonaire, and coming thence to Boston with the cargo on board. The vessel went to Bonaire, and came thence to Boston; the owners performed all that on their part was to be done, and the fact that there was no cargo on board on her homeward voyage, was the fault of the charterers, for which the owners are not to suffer.

A question was also made respecting the authority of the master to enter into such a charter-party, and the jurisdiction of admiralty over a libel upon it. As to the authority of the master, it being proved that, in point of fact, such a charter-party is within the usual limits of the trade and employment of the vessel, he has an implied authority, which is sufficient. And although admiralty would not have taken jurisdiction over the contract to use the vessel's funds to buy the cargo, it is not necessary to do so to sustain this libel, which is only to recover the freight money under the charter-party. The covenant as to the funds having been fully kept, by the readiness to advance them at Bonaire, does not in any way affect the jurisdiction of the court.

Decree of the district court affirmed, with interest at the rate of six per centum per annum and costs.