## Case No. 9,083.

### The MARIA WHITE.

[1 Hask. 204.] [1]

District Court, D. Maine. May, 1869.

SHIPPING—PERISHABLE CARGO—SALE BY MASTER—REFUSAL BY CONSIGNEES — AWAITING END OF LAY DAYS — RECOVERY AGAINST SHIPPERS FOR FREIGHT.

1. A perishable cargo may be sold by the master at the port of discharge for the benefit of all concerned, when the consignees refuse to receive it, and it cannot readily be stored in a place suitable to preserve it.

2. The master need not, before sale, await the expiration of lay-days, within which the cargo is to be discharged by the shippers, who are consignees, if they refuse to receive it.

3. Owners of the vessel, in such case, may recover from the shippers full stipulated freight, less the net proceeds from the sale of the cargo.

In admiralty. Libel in personam by the owners of the vessel against the shippers, to recover freight according to the terms of a bill of lading, for carrying a cargo of ice from Gardiner, Maine, to New Orleans, that had been sold on arrival by the master from necessity, inasmuch as it was perishable and the consignees had refused to receive it. The owners of the cargo, who were both shippers and consignees, appeared, and answered that they did not refuse to receive the cargo at the port of discharge, but that the master, without authority or necessity, sold and sacrificed it, and that the owners of the vessel are chargeable with its value, which was much greater than the stipulated freight.

Henry B. Cleaves, Nathan Cleaves, and Joseph Howard, for libellant.
William L. Putnam, for respondents.

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

FOX, District Judge. This libel is promoted by the owners of the brig, one of whom was master, to recover from the respondents Messrs. Cheeseman and Marshall, the balance of the freight for the transportation of a cargo of ice for the respondents from Gardiner to New Orleans. The bill of lading is produced as evidence of the contract. It bears date at Gardiner, August 21, 1865, and recites "the lading on board of the brig of 260 tons of ice by the respondents; ice and dunnage to be loaded and discharged by shippers, with the assistance of vessel's crew; freight $3,000." Certain stipulations are found in the bill of lading touching the care to be exercised over the cargo on the voyage by the master, upon which no question is presented. "The ice was to be delivered in like good order and condition, excepting what may be lost by the natural waste of the article, at New Orleans, the danger of the seas only excepted, unto Cheeseman and Marshall or agents, for the medical department of the United States army or their assigns. Freight for said ice, payable at place of discharge, after a proper discharge of cargo; twelve working lay-days for discharge of cargo; after that, demurrage at the rate of fifteen cents per ton on each register ton of vessel per day."

The brig arrived about seven miles below New Orleans on the 21st of September. The captain went up to the city and ascertained that one Gould was acting agent of the respondents, who were engaged in the business of shipping ice to that place. The master called on Gould that afternoon, and informed him that he had this cargo on board and was ready to deliver it. Gould replied, that he was the agent of respondents, but had not received from them any bill of lading, or instructions about the cargo. The next day, the master again called on Gould and tried to get him to receive the cargo. Gould offered to receive it, but said that he could not pay the freight or any part of it, as he had no funds. The master offered to deliver him the cargo if he would pay one thousand dollars on account of the freight and endorse on the bill of lading that the cargo had been delivered. Gould replied that he could not do it as he had no funds, and did not know as he could raise money enough to pay expense of unloading the cargo. Notice was given in the public prints, calling for the agent of respondents to come forward and receive the cargo, in reply to which, Gould again appeared, claiming to act in behalf of respondents, offering to receive the cargo and give the master sight drafts on respondents for the freight money, but at the same time informing the master, that his drafts heretofore drawn on the respondents had been returned protested for non-acceptance, one of which for $500, or $600 was shown to the master by Gould.

Gould finally notified the master that he would have nothing to do with the cargo, and that he abandoned all claims to it. The master thereupon took legal advice, and by direction of counsel the cargo was sold on the afternoon of October 4th at public auction for the benefit of whom it might concern. The quantity of ice delivered as per auctioneer's certificate was 153 tons, and the net amount realized was $664.85. The sale was advertised in three daily papers, and a large company was in attendance. The respondents had another cargo of ice at the time in New Orleans, and so far as there is any evidence before the court, the sale was fairly and honestly conducted, and the fair cash value realized.

The vessel was not entered at the custom house until September 23d, and did not reach her berth until that day, but she could have been ready to discharge on the morning of September 22d, if Gould had been prepared to receive the cargo and pay freight according to the bill of lading. The master remained at New Orleans until the 29th of October, but he received no communication from the respondents, and it is not shown that the bill of lading was ever forwarded by them to New Orleans, or that at any time they advised Gould, or any other person there, in relation to the cargo. The master applied to the medical department at New Orleans to receive the cargo, but it was declined.

The answer of the respondents admits that the master did notify their agent at New Orleans of his arrival, but claims that the notice was given on the 23d, instead of the 21st, and sets forth in justification, "that defendants at that time reasonably expected and supposed that their said agent at New Orleans would, on the arrival of said cargo, have sufficient funds to pay said freight, and they now believe that he did have sufficient funds as aforesaid, but that they are informed and believe that when called on by the master of said vessel as alleged in said libel, he did refuse to pay said freight in the manner stipulated as aforesaid, but he did not refuse to receive said cargo, or have anything to do with it, but gave as a reason for not paying freight that he had no funds, but that he would receive the cargo and give sight drafts for the freight on defendants, which drafts would have been duly honored and paid."

The agency of Gould is therefore fully admitted by the respondents, and I am satisfied from all the evidence in the case, that at last, he abandoned the cargo to the master and refused to have anything to do with it; and that before this, he had been requested by the master to obtain instructions from his principals by telegraph, to which he replied that the lines were out of order; and on another occasion that he had received no reply from them. Whilst I am still of opinion, as I intimated at the trial, that the mere declaration of the agent, that he had sent a telegram but had not received a reply,

may not be admissible as evidence of the fact that such a telegram had been sent by him, I think the fact of the agent's having so informed the master is legal evidence bearing upon the question of good faith on the master's part, and of his desire and pur-, pose to obtain directions from the shippers as to the disposition to be made of their property.

The agent, whose duty it was to receive this property, having thus abandoned it with the information to the master that he could get no instructions from the shippers, what was the duty of the master under all the circumstances? In the case of an ordinary cargo, the duty of the master under such circumstances, is settled by the supreme court of the United States, in the case of The Eddy, 5 Wall [72 U. S.] 495. In the opinion Judge Clifford says: "When the goods are not accepted by the consignee or owner of the cargo, the carrier should not leave them exposed on the wharf, but should store them in a place of safety, notifying the consignee or owner that they are so stored, subject to the lien of the ship for the freight and charges, and after he has done so, he is no longer liable on his contract of affreightment."

The master has a lien on his cargo for the freight due thereon, but this lien is a mere right of retention to hold the property as security for the payment of the amount due, and does not authorize him to sell the property to obtain the amount. His proper course is, either to retain the property from the consignees, or else to libel it in admiralty, as this is a maritime lien, which the district court of the United States will enforce and render available by taking the property into its custody, and determining the amount due, and ordering a sale of a sufficient portion to realize the amount with incidental expenses. I do not think any case can be found, which will justify a sale by a master of a portion of his cargo merely to defray his lien for its freight. If such an one is reported, it has escaped my observation. If this is the only ground on which this sale is to be sustained, I should think the master was not justified. It is claimed, however, that it was a necessity; that the master was so situated that he could not adopt any other course; that he was obliged, from the very necessity of the case, to act as he did; and on the whole, I am inclined to adopt this view of the transaction.

The agent of the shippers had, by his abandonment of the property, so placed the master that he had become the agent for all parties interested, and he had reason to believe that the shippers had themselves consented to that condition of things, as no advices or bill of lading had been received from them, although the master believed that an attempt had been made to obtain their directions. He was in a warm climate with a cargo of a most perishable nature, fast wasting away by the mere heat, more than forty per cent. having, as it appears, been already lost. The cargo was of a character which required a special warehouse for its preservation, one of peculiar construction, built for storing ice, and there is no evidence before me that such a building could have been obtained by the master, excepting that belonging to respondents, and this only by his surrendering all claim on the property and delivering it to their agent, taking drafts upon them for payment, which he had good reason to believe would be protested, and which he was under no obligation to receive and abandon his lien.

The cargo was of such a nature that it would very much diminish by its removal, and it must also have been attended with very great expense, the article being excessively bulky in proportion to its value. The bill of lading requires the cargo to be discharged by the shippers with aid of the crew, and there is not any evidence before me of any resources at the captain's command, to defray the expenses of discharging, if a place could have been obtained for it. It is true the master might have instituted, before the district court of the United States, a libel for his freight, but I apprehend the consequences would have been, that after defraying the court expenses, a much smaller amount would have remained to the credit of the defendants than now appears. It is claimed that the sale was made before the lay-days stipulated in the bill of lading had expired, and such appears to have been the case. But the sale was delayed to so late a day, that the vessel could not possibly be discharged before the expiration of the lay-days, and the respondents never appeared to claim the benefit of the lay-days under the bill of lading. The agent having declined to receive the cargo, and the master having become agent for all interested, I do not think he was absolutely bound to wait for the expiration of the lay-days before the sale.

In 1 Pars. Mar. Law, 248, it is said: "If the charterer has refused to load a cargo, the master should proceed at once to obtain another, and not wait till the time expires during which the charterer had a right, by the charter party, to put on board goods." He cites Blight v. Page, 3 Bos. & P. 295, note, where a vessel was allowed thirty lay-days by the charter, but on her arrival, the captain was informed by defendants' agents that the government had prohibited the exportation of the cargo, and that it would not be in their power to furnish it. The captain however, entered the port and remained forty-nine days, and then returned in ballast. Lord Kenyon held, that notice having been given to the master that the cargo would not be provided, there was no pretence to hold the defendant answerable for demurrage. This authority is cited with approbation by Cowen, J., in Heckscher v. McCrea, 24 Wend. 309, where he says: "It

was completely ascertained that Low, Wilson & Co. could not fill the 130 tons, and the ship was not even bound to remain till the lay-days had expired with any view to performance. And if there is nothing more in the case, the master might have immediately weighed anchor and sailed for home. The defendant's contract might be considered as pro tanto already broken, and the master absolved from the duty of all further stay."

The case of Avery v. Bowden, 85 E. C. L. 728, affirmed on appeal, 88 E. C. L. 952, is not inconsistent with this view of the law, as Lord Campbell, in delivering the opinion of the court, states that the evidence did not show an absolute refusal to provide a cargo for the ship, but he says: "If the defendant, within the running days and before the declaration of war, had positively informed the captain that no cargo had been provided, or would be provided for him at Odessa, and that there was no use in his remaining there any longer, the captain might have treated this as a breach and renunciation of the contract; and thereupon, sailing away from Odessa, he might have loaded a cargo at a friendly port from another person, whereupon the plaintiff would have had a right to maintain an action on the charter party, to recover damages equal to the loss he had sustained from the breach of contract on the part of the defendant. The language used by the defendant's agent before the declaration of war can hardly be considered as amounting to a renunciation of the contract, &c."

Curtis, J., in Clarke v. Crabtree [Case No. 2,847], says: "It is objected, that the master waited but twenty-four hours at Bonaire; that if a master sails away, without waiting the stipulated number of lay-days, if the number is stipulated, or a reasonable number, if there be no stipulated number, he cannot recover for dead freight, and that the evidence shows, that three to five days is the usual and therefore the reasonable number at Bonaire. But the evidence only proves three to five days, the ordinary time occupied in taking a cargo of salt on board there; not to wait to find a cargo; and if the master ascertained, in less than twenty-four hours that by waiting three to five days, he could not obtain a cargo, he was not only not bound to wait, but he had no right to wait and impose the charge of lying there on the charterers." I do not deem it an insuperable objection to the validity of the sale of the cargo of the Maria White that it occurred before the expiration of the stipulated lay-days. Was the sale justifiable from necessity?

In Arthur v. The Cassius [Case No. 564], Story, J., says: "But suppose in the next place there was a final refusal to receive the cargo by the consignee, did that authorize the master to carry it to New Orleans? * * * I agree that in cases of necessity, the master becomes by mere intendment and

authority of law the agent of all concerned, as well of the owners of the cargo as of the ship. But this right of the master is to be clearly made out by unquestionable proof of such necessity. In the present case, the cargo could have been landed at Velasco, which was the port of destination. Then there was no necessity of carrying it elsewhere. It is said, it could not have been sold at Velasco for want of money in the hands of purchasers. Be it so. But there was no necessity of any sale, the cargo was not perishable, and therefore the sale would have been unjustifiable on the part of the master, since it would not have been a sale from necessity. * * * If the consignee refused to receive the cargo after it was landed, and to give the bill on New York for the freight, then it became the duty of the master to place the same in the hands of some trustworthy person for the security of his lien for the freight, and, subject thereto for the benefit and account of the owners. But no right, even under such circumstances, could exist on the part of the master to sell the cargo, unless it was perishable and might otherwise have been lost or have perished. * * * It might, perhaps, have admitted of a very different construction, if the cargo could not have been landed at Velasco, or there deposited in safety for the owners, or if the sale had become indispensable from the perishable nature and condition thereof."

In that case, the cargo was lumber, freight payable in New York; applying the principles there laid down to this cargo of ice, in a warm latitude, fast wasting away, with no proper place for storage, and with no funds to pay the expenses of discharging the cargo, I am well justified in holding that this sale was from necessity, and authorized under the special circumstances attending it. It would perhaps have been more in strict accordance with his duties, after the agent had abandoned the cargo, if the master had himself attempted to communicate with the shippers by telegraph. But I think that his failing so to do should not be held so great a violation of his duty, as to render invalid all his subsequent proceedings, taken under advice of counsel, and which were all conducted in good faith on his part, and which I apprehend have proved as beneficial to the respondents as any course which could have been adopted, especially as their own agent induced the master to believe, that the respondents were unwilling to send instructions in regard to their property.

In case of The Treasurer [Case No. 14,159], which was in relation to a cargo of coal, the bill of lading of which had been assigned to the libellant, but which he did not receive, Judge Sprague says: "Even if the libellant were the owner of it, the master would have been authorized," in case of an absolute refusal by him to receive the cargo, "as an agent from necessity, to dispose of

the cargo, and would have been responsible for the net proceeds, after deducting freight and his expenses and compensation as such agent." If such a necessity could exist in the case of a cargo of coal in Boston harbor, where the owner resided, and where probably a hundred places for its landing could be procured, much stronger must it exist in case of a cargo of ice at New Orleans in the early part of October, on board a single deck vessel, not very carefully stowed and protected from the sun as it appears from the great waste of forty per cent. in as many days, on a voyage from Maine.

It must be remembered, that in the very outset the respondents failed to comply with their duty. They should have forwarded the bill of lading with instructions to their agent, and provided him with funds to pay freight. All this they entirely failed to do. Their retention of the bills of lading is quite inexplicable. By their neglect, and the abandonment of their property by their agent, the master was thrown into a perplexing and hazardous situation; he was obliged to deal with a perishable article. Delay would be ruinous to the thing itself, and attended with great expense of demurrage if the cargo should be allowed to remain on board the vessel, and if removed and stored on owner's account, had it been practicable, in all probability the owners would not have been benefited thereby; under such circumstances, the conduct of the master should not be severely scrutinized by a court of admiralty, so as to establish a liability in behalf of parties as negligent as these respondents are shown to have been. The master acted honestly, and as he believed to be for the best interests of all parties under the very critical position in which he was placed, and on the whole, the shippers have no right or occasion to object to his conduct in their behalf.

The libel contains a claim for three days demurrage which is not allowed. Decree for the freight, less the net proceeds of sales of cargo at New Orleans, viz. for $2,335, and interest from date of filing libel.