## J. J. MOORE & CO. v. CORNWALL et al.

### (Circuit Court of Appeals, Ninth Circuit. February 12, 1906.)

### No. 1,197.

1. SHIPPING—BREACH OF CHARTER—EVIDENCE OF UNSEAWORTHINESS.

A warranty of seaworthiness in a charter does not imply a warranty of the insurability of the vessel's cargo at the usual rates, and a refusal of insurance, while it may be considered as evidence of unseaworthiness, is never of itself conclusive thereof, but is a fact to be considered in connection with evidence of the actual condition of the vessel.

2. SAME—CONSTRUCTION OF CHARTER—OPTION OF CHARTERER TO CANCEL.

A charter party contained the following provision: "Captain to furnish charterers a certificate from charterers' marine surveyor (at San Francisco) that the vessel is in proper condition for the voyage. Should the vessel fail to pass a satisfactory survey, this charter to be void at charterers' option." Held, that such provision contemplated an actual survey, and that the surveyor was not authorized to refuse a certificate without such survey because of the age of the vessel and the length of time she had been on her metal, nor did such refusal justify a cancellation of the charter by the charterers, who had knowledge of such facts when the charter was made.

3. SAME—BREACH OF CHARTER—DAMAGES.

While the owner of a vessel which the charterer has refused to accept is bound to use diligence in rechartering, he is not required to accept an offer made during the lay days contracted for in the charter, because of a letter of refusal from the charterer based upon an erroneous assumption of fact and an erroneous construction of the charter, where the owner had reason to suppose the grounds assigned would be removed or not insisted on when properly understood, and especially when the charter offered would require the vessel to proceed to another port for loading.

Appeal from the District Court of the United States for the Northern District of California.

For opinion below, see 132 Fed. 868.

On January 16, 1902, the ship Spartan was chartered to J. J. Moore & Company, a corporation, to carry a full and complete cargo of grain, lumber, and/or other lawful merchandise from San Francisco to Sydney or Melbourne, as the charterer should elect; the owners to be paid $9,750 if the cargo was discharged at Sydney, and $11,250 if at Melbourne. The charter party provided for 14 lay days, to commence 24 hours after the vessel was at the dock at San Francisco ready to receive cargo. It contained also the following provisions: "Said vessel shall be tight, staunch, strong and in every way fitted and provided for such voyage, and receive on board for the aforesaid voyage the merchandise hereinafter mentioned. * * * Captain to furnish charterers a certificate from charterers' marine surveyor (at San Francisco) that the vessel is in proper condition for the voyage. Should the vessel fail to pass a satisfactory survey, this charter to be void at charterers' option. Vessel to dunnage and ballast sufficient for the proper care and loading of the aforesaid cargo, and to be stowed under the captain's supervision and direction." On January 24th the charterer was notified that the vessel had been prepared for the voyage. It replied in writing, making two objections, as follows: "We beg to inform you that our surveyor, Captain Perriman, informs us that the vessel has got considerably more ballast in her than is necessary for the freighting of the cargo which will go in the ship, consequently she is not ready to commence receiving cargo under the conditions of the charter party. We also understand from Captain Perriman, as well as Captain Polite, master of the ship, that water was found on the

transom on her last voyage, indicating a leak in the ship, and, although the vessel was docked to find this leak, it was not found. Inasmuch as the vessel will carry perishable cargo, it will be necessary for us to have a certificate that the vessel is in first class order and condition, and inasmuch as we have cargo waiting for the ship, and want to commence loading her, we must ask you to give this important matter your immediate attention." On the following day the managing owner, in answer to that letter, wrote the charterer notifying it that the ship would be ready to be turned over to it to receive cargo on January 27th, at 3 o'clock in the afternoon, with 200 tons ballast in, and the necessary spruce lumber ready to cover the ballast, which would be properly placed over the ballast early on Monday after receipt of information requested in the letter as to the nature of the cargo and the way it was to be loaded. The letter proceeded as follows: "In reference to the quantity of ballast she is carrying, I would state that, in the judgment of her captain, there is not more ballast in her than is necessary to the safety of the ship in the absence of any definite information as to the relative proportions of the goods composing her cargo and the manner in which it is to be stowed. If you will give me a written statement, showing approximately the quantity and kind of lumber, if any, to be put next to the dunnage, and approximately the quantity, if any, of barley or other cargo to be loaded in the lower hold and between decks and on deck, the weight of the ballast she should carry can then be intelligently determined by the surveyors, and if the ballast now in her hold is considered by them to be more than necessary, the surplus shall be taken out and the ship turned over to your company to be loaded in accordance with your cargo statement, and the judgment of the surveyors. * * * It is not true that there is or has been a leak in the ship; neither is it true that the vessel was docked for the purpose of finding a leak. The ship 'Spartan' is in first class order and condition." No reply was made to this letter.

On January 27th the managing owner of the ship sent a written request to the charterer's surveyor that he go on board the vessel with two other surveyors and make a survey. On reading the letter the charterer's surveyor answered the request verbally saying: "I don't want anything more to do with her. I have quit." The two other surveyors went to the vessel, having procured from a clerk of the charterer an unsigned pencil memorandum of the proposed cargo. They examined the vessel and gave the managing owner a certificate that they "found the ship to be properly ballasted, tight, staunch and seaworthy, and in every way well fitted and found for the voyage." On January 27th the owner sent the charterer a copy of that certificate and a letter, which reads as follows: "Dear Sirs: Not having received any reply to my letter of Saturday, the 25th inst. re. ballasting and loading the ship Spartan as per charter party with you, I have this day had an examination of the ship made by a board of marine surveyors, A. M. Burns and W. F. Mills, and herewith inclose a copy of their report for your information. I had spruce lumber placed this morning on the wharf alongside the ship ready to be placed in on the ballast under the direction of your surveyor, Captain Perriman, or such other surveyor as you might select; but no reply was received from you as to what portion of the cargo and how much of it was to be loaded first in the ship, and I am waiting yet for that information with the hope and intention of placing it in such a way as to be satisfactory to your marine surveyors. The dunnage will be placed over the ballast early tomorrow morning, and I expect to have the ship ready by 2 o'clock in the afternoon of the same day. I will have a tug boat engaged ready to tow the 'Spartan' to any wharf in the Bay of San Francisco that you or any agent for you may direct, so that the lay days of the ship 'Spartan' will commence on Wednesday morning the 29th of this month." The charterer, in answer to that letter, wrote the owner on January 28, 1902, stating that Captain Perriman, its surveyor, declined to issue the certificate, and saying: "He is not satisfied that the vessel is fit to carry a dry and perishable cargo such as grain, which it is intended to put on board, and in this conclusion he is more than supported by the fact that the insurers decline to insure such cargo on board such vessel, except at very ex-

orbitant rates." The letter proceeded to say that the charterer would exercise its right to rescind the charter party "unless we can come to some reasonable adjustment of our differences." The letter contained the suggestion that the owner name a surveyor to meet Captain Perriman, and that the two so named choose a third competent surveyor to determine, upon receiving a statement of the cargo to be carried, the amount of ballast required by the vessel to make her seaworthy for the proposed voyage, and that thereafter the charterer would employ another surveyor to determine the question of the fitness of the vessel to carry the grain cargo intended for her. To this the managing owner answered, stating that Captain Perriman had had the opportunity to join with Captain A. M. Burns in selecting a third member of the board of survey, and that he had suggested the appointment of Mr. Mills, and knew when the survey was to be made, but excused himself from going on account of another appointment. The letter added: "Early yesterday the dunnage was placed on the wharf alongside the ship as per my letter to you of the 27th inst., but I had the placing of it over the ballast delayed until late in the afternoon in the hope that you would in the meantime give me the information requested in my letter of Jan. 27 in regard to the cargo. Finally, at about 3 o'clock in the afternoon of yesterday, we commenced putting in and placing the dunnage and expect to have it completed in the course of to-day. We will therefore waive the question of demurrage for to-day and notify you that the ship 'Spartan' will be ready to receive cargo tomorrow morning at 9 o'clock, and that the lay days will commence to count from 1 o'clock p. m. Jan. 30." On January 29, 1902, the charterer replied: "We perceive that you decline to accede to the suggestions contained in ours of yesterday. Inasmuch therefore as you have failed to furnish us with a certificate from charterers' marine surveyor (at San Francisco) that the vessel is in proper condition for her proposed voyage, as provided in the charter party, we beg to notify you that we will avail ourselves of the option therein contained to consider the charter party void, and the same is accordingly canceled." The owner answered, denying that the charter party was canceled, and directing the attention of the charterer to other matters which are hereafter more particularly referred to in the opinion. In September, 1902, the owners of the vessel filed a libel against the charterer for damages arising from its breach of the charter party. The District Court, upon the issues and the testimony, found that the ship was in fact seaworthy as warranted in the charter party, and that the option by the charterer to rescind was not properly exercised, and awarded to the libelants damages in the sum of $4,209.91. From that decision the charterer appealed.

Nathan H. Frank, for appellant.

Bruce Cornwall and Henry E. Monroe, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The appellant contends that in the provision of the charter party that the vessel was to be tight, staunch, strong, and in every way fitted and provided for the contemplated voyage, there was an implied warranty that she should be a proper subject for insurance at the ordinary rates for the cargo and the voyage, and that there was a breach of the warranty. The appellant's president testified that he applied to insurance brokers, and that they reported to him that they were unable to obtain such insurance. Their report is embodied in their letters to the appellant of date January 27, 1902, and January 28, 1902. The first of these letters said:

"In reply to your verbal instructions to place marine insurance amounting to $50.000.00 on barley per said vessel, I beg to state that it is impossible to effect this insurance covering particular average."

The second letter was as follows:

"I regret to state that your order for insurance on barley cannot be executed in this market as companies here will not write 3 per cent P. A. by this vessel, as she is so old, is unclassed and is such a long time on her metal."

Neither of these brokers testified as a witness in the case, but two officers of insurance companies testified on behalf of the appellant, one of whom said that, if a vessel had been on her metal more than two years, "the conservative underwriter would not underwrite her at all, not for grain." The other said, "I would not recommend any underwriter to take any risk on any wooden ship that had been on her metal eight years," and in answer to the question whether in every instance a vessel would be considered not in good condition, if she had been on her metal eight years, he replied, "Oh, no; the condition would have to be ascertained otherwise." A marine surveyor also testified that he would consider the fitness of a vessel that had been eight or nine years on her metal, to carry grain from San Francisco to Australia, very questionable. An important fact to be considered is that the refusal of the underwriters to insure was not made the ground of the rejection of the charter by the appellant, and was not in the answer to the libel specified as a breach of the warranty of seaworthiness. The answer denied the allegation of the libel that the vessel was tight, staunch, strong, and in every way fitted and provided for making the voyage, but it set up as ground for rescission of the contract only the fact that the owner had failed to furnish the certificate of the charterers' marine surveyor, as provided in the charter party, and it alleged that on that account the charterer had exercised its option to declare the charter party void. It will be remembered that on January 27th Captain Perriman had said: "I don't want anything more to do with her. I have quit." On receipt of this answer, the owner obtained a certificate of inspection and survey by two marine surveyors and sent it to the appellant. The appellant answered by its letter of January 28th, and then for the first time mentioned the subject of insurance. The letter, after referring to the clause which stipulates for a certificate of the charterer's marine surveyor, said:

"Captain Perriman, who is our surveyor, declines to issue the certificate called for by the above provision of the charter party. He is not satisfied that the vessel is fit to carry a dry and perishable cargo such as grain, which it is intended to put on board, and in this conclusion he is more than supported by the fact that the insurers decline to insure such cargo on board said vessel, except at very exorbitant rates. We are satisfied, from information given us by one of the surveyors whose certificate you have inclosed to us, that they misapprehended the facts of the case when they made the certificate which you inclosed."

The letter proceeded to say that the right to rescind the charter party would be exercised, "unless we can come to some reasonable adjustment of our difficulties."

The appellant was acquainted in a general way with the history of

the ship and knew her age at the time of entering into the charter party. It had chartered her in the year 1896. It entered into that charter party on a report of its surveyor that at that time she had been on her metal 11 years. J. J. Moore admitted that, if the appellant's surveyor had made a survey in accordance with the provisions of the present charter party, he might possibly have obtained insurance. It is not shown what representations of fact as to the condition of the vessel were made by the brokers who sought to obtain insurance. It may be assumed that insurance was refused for the reason that the vessel was old and had been eight years on her metal. That a vessel might be eight years on her metal and still be in condition to be an acceptable risk to underwriters is shown by the admission of one of the expert witnesses for the appellant. The refusal of insurance in the present case was based, not upon an inspection of the condition of the vessel, but upon a rule of the insurers. We find no case in which it has been held that the impossibility of obtaining insurance is sufficient in itself to establish a breach of the warranty of seaworthiness. In The Vincennes, 3 Ware, 171, Fed. Cas. No. 16,945, Judge Ware said: "But the owners did not covenant that the charterer would get insurance. It covenanted only that their vessel was seaworthy and thus insurable." And elsewhere said: "The whole question of seaworthiness, then, comes to the actual condition of the vessel." The appellant cites and relies upon The Vesta (D. C.) 6 Fed. 532; Card v. Hine (D. C.) 39 Fed. 818; and Bert, Potter & Hughes v. Hardie (D. C.) 132 Fed. 61. In the case of The Vesta, the vessel was chartered for the transportation of wheat in bulk, under a warranty that she should be tight, staunch, and strong, and in every way fitted for the voyage. Neither of the parties to the charter party had seen the vessel. Before proceeding to load, the charterer attempted to procure insurance on the cargo of wheat, but the risk was declined on the ground that the vessel was old and built of soft wood. On the trial testimony was taken as to the fitness of the vessel for the voyage. The court said:

"The circumstances of the case seem to confirm the opinions of those called by the respondent, who pronounced the vessel unfit to carry wheat in bulk across the Atlantic in the winter months. * * * The charterer would certainly have acted more wisely if he had insisted upon a stipulation in the contract that the vessel should be a good sea risk for the merchandise specified as cargo. But the impressive fact remains that no insurance company could be found, after reasonable search, that was willing to assume the risk of this voyage, under the circumstances stated. To require the charterer to load such a vessel would be a hardship which these parties could not have contemplated when the charter party was signed. It should be noticed that neither of the parties had ever seen this vessel, or knew anything of her condition until she arrived in Boston. * * * Upon all the evidence, I am of opinion the libelant's warranty was broken, and the respondent was justified in refusing to load the vessel."

In that case it is clear that the court did not regard the refusal of underwriters to insure proof in itself of unseaworthiness, but only evidence tending to show that the vessel was unseaworthy.

In Card v. Hine, the charter party provided that the vessel must be tight, staunch, strong, and classed 100 A 1. It was entered into on June 5, 1887. The vessel was to reach Charleston, her loading

port, on or before November 30th of that year. On November 9th she grounded on the rocks. On November 15th she was inspected at Montreal. A small leak was found in her water tank forward. A more complete survey would have required her to go to Quebec and into the dry dock. She arrived at her port of loading on November 28th. Before her arrival certain insurance agents had received instructions from the companies which they represented not to take risks on the vessel, unless survey was first had to ascertain the result of her grounding. The charterer refused to load her. The court held that, while at the date of the charter party the vessel was in every respect tight, staunch, strong, classed 100 A 1, and fitted for her voyage and cargo, she was not in such condition after she had grounded on the rocks. The court said:

"This apprehension of the insurance companies did not arise from mere suspicion or blind prejudice or caprice. It had a substantial basis—a reasonable ground of apprehension. * * * His charter party called for the highest classification, 100 A1. This is not a warranty that the charterer could get insurance, but it is a warranty that she was insurable; that is to say, a proper subject for insurance at the ordinary rates for such a cargo and such a voyage"—citing Premuda v. Goepel (D. C.) 23 Fed. 411.

The fact that the court relied upon the case last cited leads us here to digress to consider what was there decided. In that case the charter party warranted that the vessel should be seaworthy and in all respects tight, staunch, strong, and every way fitted for such a voyage. Difficulty was found in obtaining insurance on the cargo on account of the unsatisfactory rating of the ship. An inspection was made by the principal marine insurance companies, who reported that about one-third of her deck beams in her upper and lower decks between the fore and mizzen masts were materially decayed; that there were defects in part of the knees; that her water ways were too much open to admit of caulking, and other defects concealed. The court said:

"The fact that certain insurance companies refused insurance is not, indeed, conclusive evidence that the ship was not seaworthy, nor is the fact any more conclusive that the ship was seaworthy that she made a subsequent voyage without foundering. Seaworthiness is indeed a fact to be ascertained and determined like any other question of fact. The almost unanimous refusal of the several insurance companies to insure the cargo upon this vessel, not being limited to rate, becomes very strong presumptive evidence of the unseaworthiness of this vessel in the judgment of those most especially called upon to examine and determine such questions. This was followed up by further proof of a careful examination by a surveyor sent for the purpose to determine whether insurance should be taken or not."

Upon these facts, and the additional testimony which was taken on the subject of the seaworthiness of the vessel, the court held that the charterer was justified in refusing to load.

The case of Bert, Potter & Hughes v. Hardie adds little light to the question under consideration. In that case, after loading some 13,000 cans of refined petroleum in the fore part of the lower hold, the charterers desired to load for another party 300 tons of flour in sacks, to be stowed in the after between decks. Being apprehensive that the flour might be damaged by fumes from the oil, the master

required the charterers to indemnify him against such risk, or to have the owners waive any claim for damages on that account. These demands were refused. Both parties unsuccessfully attempted to obtain insurance against the risk. The master refused to load the flour. It was held that his action was justified. The court, referring to the master's apprehension about the danger to the flour, said that one of the most cogent evidences that it was well grounded was the fact that no underwriter could be found to indemnify the parties against the risk, and used the language which is relied upon by the appellant:

"This question of insurance now enters largely into mercantile transactions, and the absence of willingness on the part of underwriters to undertake the full hazard at any rate of premium is a strong argument in favor of the master's position. It has even been held that an inability to secure insurance is sufficient to condemn a vessel as to her seaworthiness, where there was some doubt about the sufficiency of the hull, even when she afterwards safely makes the voyage sought to be insured"—citing Premuda v. Goepel, Card v. Hine, and Svendsen v. Stursberg, 31 Fed. 86.

In Svendsen v. Stursberg, Judge Benedict held that the warranty of the seaworthiness of a ship is a warranty that the ship is in such a fit condition, for all the ordinary hazards of the contemplated voyage, as to be approved as seaworthy in the judgment of impartial, competent, and experienced men versed in that business. In that case the proof showed that four impartial, competent, and experienced persons, agents of various underwriters, after examining the ship, formed and expressed the judgment that the ship was not seaworthy. No reason was assigned for their adverse opinion, other than the condition of the ship as visible to them. The owner refused to dock the vessel for examination. The court said: "This omission indicates to my mind that what was visible of the ship afforded just ground for the belief that such an examination would disclose an unsound bottom"—and the court held that the charterers were justified in rejecting the vessel.

In Towse v. Henderson, 4 Ex. 890, Parke, B., said:

"It may so happen that, when the vessel arrives at the port, there may be a general belief that she is unseaworthy or unfit to receive a cargo on board, which would prejudice the charterer; but the circumstances of that suspicion cannot affect the plaintiff's right to receive the cargo on board. All he undertook was that the vessel should be really fit to receive the cargo on board. We are all of opinion that the plaintiff was not bound to have his ship in such a condition as to be free from all suspicion."

It is the doctrine of these decisions, and we think it sound doctrine, that the warranty of seaworthiness does not imply a warranty of insurability at the usual rates, and that the refusal of insurance, while it may be considered as evidence of unseaworthiness, more or less convincing according to the circumstances of the case, is never of itself conclusive evidence thereof, but is a fact to be considered in connection with evidence of the actual condition of the vessel. The owner of a vessel, when he enters into a charter party, is answerable for her condition. He is not answerable, unless he expressly so contracts, for the decision, the caprice, or the arbitrary rule of the insurance companies, even though such rule, abstractly considered, may not be unreasonable. The question in the present case, when all is

said. resolves itself into the inquiry: What was the actual condition of the vessel? The ample evidence which was taken on that issue justifies, we think, the conclusion of the district judge that the condition of the Spartan was such as to comply with the expressed warranty in the charter party.

We come then to the question whether the option of the appellant to cancel the charter party was rightfully exercised. That instrument provided as follows:

"Captain to furnish charterers a certificate from charterers' marine surveyor (at San Francisco) that the vessel is in proper condition for the voyage. Should the vessel fail to pass a satisfactory survey, this charter to be void at charterers' option."

It thus appears that the option was to be exercised, if the vessel failed to pass a survey satisfactory to the appellant's marine surveyor. Captain Perriman, who was the appellant's marine surveyor, admitted that he made no survey. The reason he assigned for not making it was that the captain of the Spartan did not give him the opportunity. "He had the ballast in the vessel. He had 200 tons of ballast in. I wanted him to take it out, but he would not do it." It is not disputed that the vessel had 200 tons of ballast in her, and that Captain Perriman demanded that it be removed. But the overwhelming weight of the testimony is that he demanded its removal, not for the purpose of making a survey, but because he deemed the ballast unnecessary for the voyage. The district judge, who heard the testimony, reached the conclusion, from the evidence, "that the libelants did nothing to prevent, but, on the contrary, made reasonable efforts to secure the survey contemplated by the charter." This is abundantly sustained by the record. The evidence shows that the objection made by Captain Perriman was that there was too much ballast in the vessel. In none of the correspondence of the parties does it appear that at any time he or the appellant demanded that the ballast be removed for the purpose of a survey, or that it was contended that a survey could not be made on account of the ballast which was then in the ship. Captain Perriman, on his direct examination, was asked the question whether there was any reason for his refusal to give a certificate beyond the question of his judgment of the fitness of the vessel to carry the grain cargo on the voyage, and he answered: "Only the ballast. * * * Too much ballast in her." Again, in his testimony, he stated that, in refusing to give the certificate, he was acting on his best judgment as to the condition and fitness of the vessel to carry the cargo, and that he had made his examination and was done with it. In short, the correspondence between the parties and the testimony of Captain Perriman, on his direct examination, all show that it was the understanding of Perriman and the appellant that the latter had the option to cancel the charter party upon the bare refusal of the former to give the required certificate, and that a survey was wholly unnecessary. Captain Perriman's contention was that the ballast must be removed permanently. He said: "The ballast had all to come out of her. and the barley go down in the lower hold. * * * That vessel would not require anything at all, any ballast in her hold at all."

The owner, on the other hand, contended that the vessel had no more ballast in her than was necessary. Captain Perriman testified that, when the owner made the demand upon him for the certificate, he replied: "I don't want anything more to do with her. I have quit." There was testimony of two witnesses, one of whom said that Captain Perriman had declared that it was simply a question of the amount of ballast that the dispute was about. The other testified that Captain Perriman said: "The survey is all right, but it is a question of ballast." Captain Perriman himself, on his direct examination, said: "There was nothing about the certificate at all. I just would not give them any certificate until I saw what ballast the vessel would need."

But the appellant contends that an actual survey was not necessary in order to justify the charterer's surveyor in declining to give the certificate, and that his refusal was based on consideration of questions of the fitness of the vessel, which did not require a survey for their determination, such as the age of the vessel and the length of time she had been on her metal. The age of the vessel was known to the appellant at the time of entering into the charter party. That she had been eight years on her metal might, or might not, render her unseaworthy. It is true that the contracting parties agreed that the decision of the marine surveyor should be final. But they did not leave the question to his arbitrary decision. If such had been their intention, there would have been no necessity for providing for his certificate, and the whole question of the fitness of the vessel might as well have been left to the decision of the appellant itself. The agreement was to abide by the decision of the surveyor, but it contemplated that he should make an actual survey and inspection of the vessel and employ the usual tests to ascertain her condition. The District Court found precedents applicable to such a case in a line of decisions, such as Herrick v. Belknap, 27 Vt. 673; Smith v. Boston, Concord & Maryland Railroad, 36 N. H. 458; and McMahon v. New York & Erie R. R. Co., 20 N. Y. 463. Those were cases involving the construction of contracts for the construction of railroads in which the measurements of the work were to be made and the amount of the labor determined by the defendants' engineers, whose decision was to be final. The courts held, in substance, that the contracts called for honest and actual measurement by competent engineers. To those citations we may add the similar case of Crane Elevator Company v. Clark, 80 Fed. 705, 26 C. C. A. 100, in which it was said:

"The parties have, however, the right to demand that the umpire shall, with respect to every matter submitted to his determination, exercise an independent and honest judgment, and that he shall not arbitrarily refuse to accept performance or to give a certificate."

The appellant cites Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; Sweeney v. United States, 109 U. S. 618, 3 Sup. Ct. 344, 27 L. Ed. 1053; Railroad Company v. March, 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. Ed. 255; Chicago, S. F. & Cal. R. R. Co. v. Price, 138 U. S. 185, 11 Sup. Ct. 290, 34 L. Ed. 917; and United States v. Gleason, 175 U. S. 602, 20 Sup. Ct. 228, 44 L. Ed. 284—cases which sustain the doctrine that, with respect to the subject-matter submitted to an umpire, his determination is final and may be impeached only for

fraud, collusion, gross mistake, or a failure to exercise an honest judgment. Applying that doctrine to the present case, there can be no question that, if the appellant's marine surveyor had made a survey of the vessel and had thereupon refused a certificate, his decision could be impeached only upon the grounds above indicated. But here, the surveyor has failed to comply with the terms of the charter party by declining to make a survey. The owner of the vessel had the right to expect that such a survey would fully establish her seaworthiness and satisfy the surveyor, notwithstanding her age and the length of time she had been on her metal. He was willing to accept the judgment of the marine surveyor only after the latter had put himself in possession of the actual facts. Until that was done, the owner had the right to say that the charter party was in full force and effect.

It is contended that the court erred in finding that the owner of the ship was not bound to accept the offer of another charter, which was made prior to the expiration of the lay days, by the acceptance of which he might have reduced the damages resulting from the breach of the contract. On January 29, 1902, the appellant notified the owner in writing that, inasmuch as he had failed to furnish the certificate provided for in the charter party, it availed itself of the option to consider the charter party void, and accordingly canceled the same. On the following day, the owner answered, denying that he or the captain of his vessel had refused the certificate, and denying that the charter was canceled or void, or that the appellant had any option to consider the charter party void or canceled; and asserting that the same was in full force and effect, that he would abide by and live up to it in all its terms, and that he expected the appellant to do the same. No reply was made to this answer of the owner, and on February 6, 1902, the owner again wrote notifying the appellant that the ship had been ready since January 30, 1902, to receive cargo, as provided in the charter party, and requesting it, it it had decided not to load and proceed under the charter and not to take the vessel as agreed, to notify him at once, in order that he might take steps to procure a satisfactory charter, and thus reduce the loss to be borne by it because of its breach of the charter party. On the following day the appellant answered, referring the owner to its letter of January 29th, and informing him that he had had no occasion since that date to defer rechartering. In the meantime, on January 30th, the owner received from a shipbroker the following letter:

"Mr. Moore informed us this afternoon he had canceled charter of the 'Spartan' to Melbourne, etc. We can make you a firm offer on her from Puget Sound as follows: 40 S. Sydney 48–9 Melbourne N. W. F. with 20 days for loading and custom of the port for discharging. All other terms per usual lumber C. P. There is also business to be had for China and West Coast, but must have refusals."

The owner answered this letter on February 6th, denying that the charter was canceled and saying:

"The charter is still in force and effect, and the lay days are counting against J. J. Moore & Company. * * * Should it later appear that J. J. Moore & Company desire to break, and do break, the agreement of charter for the ship 'Spartan,' I will then, of course, consider any further offers for a new charter, in order that the amount of damages in the matter may not be unnecessarily increased."

On February 8th the owner wrote the appellant that no acceptable charter had been offered for the ship, and that, until one should be offered such as to warrant acceptance, the rate of demurrage provided for in the charter party would be charged to it.

The owner was bound to use all diligence in rechartering his vessel, and could not, in the absence of such diligence, claim damages. The measure of his damages is the net amount that would have been earned by the vessel under the charter sued on, less the net amount earned, or which might with reasonable diligence have been earned, by the vessel during the time required for the performance of the voyage named in the charter party. Leblond v. McNear (D. C.) 104 Fed. 826; Smith v. McGuire, 5 Hurl. & N. 544; Steamship Company v. Card (D. C.) 59 Fed. 159. The owner of the Spartan received no offer of employment for his vessel other than that which is above referred to, and there is no evidence that he could, with reasonable diligence, have obtained other employment for his ship during the time which would have been required for the performance of the voyage contemplated in the charter party. The question arises, therefore, whether it was his duty to accept that offer when made. It was made before the expiration of the lay days contracted for in the charter party. The appellant cites cases which hold that, after a definite and final refusal by the charterer to furnish a cargo, the master of a vessel is not bound to wait until the expiration of the lay days, but may go upon his way. Clarke et al. v. Crabtree, 2 Curt. 87, Fed. Cas. No. 2,847; Baetjer v. Bors, 7 Ben. 294, Fed. Cas. No. 724; The Maria White, 1 Hask. 204, Fed. Cas. No. 9,083; Crabtree v. Clark, 1 Spr. 217, Fed. Cas. No. 3,314. And the appellant especially relies upon the language of the court in the case first cited, in which it was said:

"And, if the master ascertained in less than 24 hours that by waiting three to five days he could not obtain a cargo, he was not only not bound to wait, but he had no right to wait, and impose the charge of lying there on the charterers."

But it does not clearly appear from the evidence which is before us that the communication of the appellant to the owner, of January 29th, was a final or definite rejection of the contract. It was a notice of cancellation predicated upon an erroneous assumption of fact and an erroneous construction of the charter party. The reason assigned was that the owner had failed to furnish the certificate called for by the charter party. The time for furnishing that certificate had not then expired. The owner, in reply, properly denied that he had refused or failed to furnish a certificate, and he thus directed the attention of the appellant to the true construction of the contract, and especially to the fact that he still expected to obtain the certificate. He stated that he had on that day made a demand upon Captain Perriman for a certificate; that he had no doubt that the certificate would be furnished; and that, when furnished, it would be immediately presented to the appellant. Until the owner received either the refusal of Captain Perriman to make the survey according to the written demand, or some answer from the appellant to that letter, he was justified, we think, in considering the charter party unbroken, and in declining to enter into any contract for other employment of his vessel.

In a similar case (Watts v. Camors [C. C.] 10 Fed. 149, affirmed in Watts v. Camors, 115 U. S. 353, 6 Sup. Ct. 91, 29 L. Ed. 406) Pardee, circuit judge, said:

"In this case I doubt if the master of the Highbury had a right to consider the first letter a definite refusal. * * * I think the master and agent of the Highbury had a right, and it was their duty, to wait such time as was necessary to put the defendants clearly in default."

In Avery v. Bowden, 5 E. & B. 714–728, Lord Campbell, C. J., said:

"If the defendant, within the running days and before the declaration of war, had positively informed the captain of The Lebanon that no cargo had been provided, or would be provided, for him at Odessa, and that there was no use in his remaining there any longer, the captain might have treated this as a breach and renunciation of the contract; and thereupon, sailing away from Odessa, he might have loaded a cargo at a friendly port from another person. Whereupon the plaintiff would have had a right to maintain an action on the charter party to recover damages equal to the loss he had sustained from the breach of contract on the part of the defendant. The language used by the defendant's agent before the declaration of war can hardly be considered as amounting to a renunciation of the contract: but, if it had been much stronger, we conceive that it could not be considered as constituting a cause of action after the captain still continued to insist upon having a cargo in fulfillment of the charter party."

See, also, Frost v. Knight, L. R. 7 Exch. 111, and Hochster v. De La Tour, 2 E. & B. 678. In The Thomas P. Sheldon (D. C.) 113 Fed. 779, it was said:

"The delay in procuring other vessels, caused by negotiations and efforts to induce the libelee to perform its legal obligation, was, under the circumstances, both reasonable and prudent. * * * The rule of Warren v. Stoddart, 105 U. S. 230, 26 L. Ed. 1117, requires reasonable conduct on the part of one whose legal rights have been violated; but it should not be invoked by a defendant as a basis for critical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which were wiser or more advantageous to the defendant. Reasonably prudent action is required; not that action which the defendant, upon afterthought, may be able to show would have been more advantageous to him."

Not only would the owner of the Spartan have been premature in accepting the proffered charter to send his vessel to Puget Sound, but there is authority for holding that he was not bound to accept an offer which involved sending his vessel to another port to obtain a cargo. In Haries v. Edmonds, 1 Carrington & Kerwain, 686, it was held that an offer of a cargo to be taken at another port need not be accepted. Parke, B., said that the captain "was not bound to wait at Cowes for orders. It would have been out of his way, though not much; still he was not bound to go out of his way at all." In Stone v. Woodruff, 28 Hun, 534, it was held that the master of a vessel is under no obligation to proceed elsewhere than the port named in the charter party in order to obtain a cargo. At the time of the breach of the charter party the Spartan lay at San Francisco, her home port. To have sent her to Puget Sound, as proposed, would have involved a voyage of some 12 days to reach that port.

We find no error for which the decree of the District Court should be reversed. It is accordingly affirmed.